IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,437

STATE OF KANSAS,
*Appellee*,

v.

BRYCE M. DULL,
*Appellant.*

SYLLABUS BY THE COURT

1.

Statutory interpretation and jurisdictional challenges involve questions of law subject to unlimited appellate review.

2.

When the Supreme Court has granted review of a Court of Appeals decision, issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals. This court will not consider issues not presented or fairly included in the petition for review. If a party fails to challenge a dispositive procedural ruling in the petition for review, it is not properly before this court.

3.

A categorical proportionality challenge under the Eighth Amendment to the United States Constitution implicates questions of law, and this court has unlimited review. A constitutional challenge to the lifetime postrelease supervision portion of an aggravated indecent liberties with a child sentence is an indirect attack on the constitutionality of the statute as applied.

1

4.

Deciding whether a statute is constitutional is a question of law subject to unlimited review. This court presumes statutes are constitutional and must resolve all doubts in favor of a statute's validity. A statute must clearly violate the constitution before it may be struck down, and an appellate court not only has the authority, but the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.

5.

In considering a categorical challenge under the Eighth Amendment, the court first considers objective indicia of society's standards, as expressed in legislative enactments and state practices to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

6.

Mandatory lifetime postrelease supervision for a juvenile is a severe lifetime sentence, even when the potential for further imprisonment is not considered, because the juvenile's liberty interests are severely restricted for life by the terms of the mandatory lifetime postrelease supervision.

7.

While we have found mandatory lifetime postrelease supervision constitutional for adults, the same factors that result in a diminished culpability for juveniles, *i.e.*,

recklessness, immaturity, irresponsibility, impetuousness, and ill-considered decision making, along with their lower risks of recidivism, all diminish the penological goals of lifetime supervision for juvenile sex offenders.

8.

Mandatory lifetime postrelease supervision is categorically unconstitutional under *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), when imposed on a juvenile who committed and was later convicted of aggravated indecent liberties with a child.

9.

Whether appellate jurisdiction exists is a question of law over which the scope of appellate review is unlimited.

10.

K.S.A. 21-4721(c)(1) does not prevent a defendant from challenging the district court's decision to impose consecutive sentences in a multiple conviction case involving a presumptive and a departure sentence.

11.

A district court simultaneously sentencing multiple convictions generally has discretion to order the sentences to be served consecutively.

12.

Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does

not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 11, 2013. Appeal from Sedgwick District Court; PHILLIP B. JOURNEY, judge. Opinion filed June 5, 2015. Judgment of the Court of Appeals affirming the district court and dismissing in part, is reversed. Judgment of the district court is affirmed in part, vacated in part, and remanded with directions.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David Lowden*, chief attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: Bryce Dull appeals the consecutive sentences he received in two unrelated cases. In the first case filed, Dull pleaded guilty to burglary and misdemeanor theft. He had recently turned 18 years old when these crimes were committed. In the other case, Dull pleaded guilty to aggravated indecent liberties with a child. Dull was 17 years old at the time of this crime, and the victim was 13 years old. However, the district court authorized Dull to be prosecuted as an adult, and the cases were consolidated for pleas and sentencings. He was sentenced to 24 months' imprisonment for the burglary, concurrent with 12 months' incarceration for the theft, and 45 months' imprisonment for the sex crime. The sentences were ordered to be served consecutive to each other. As required by statute for the aggravated indecent liberties conviction, the district court also sentenced Dull to a lifetime of supervision by the Department of Corrections once he was released from prison.

4

Dull seeks review of the Court of Appeals' decision that mandatory lifetime postrelease supervision for juveniles convicted of similar sex offenses does not categorically constitute cruel and/or unusual punishment under the Eighth Amendment to the United States Constitution. See *State v. Dull*, No. 106,437, 2013 WL 193036, at *12 (Kan. App. 2013) (unpublished opinion). Although he argues mandatory lifetime postrelease supervision is likewise unconstitutional under § 9 of the Kansas Constitution Bill of Rights, he does not challenge the panel's holding that this issue was not properly raised for the first time on appeal. He additionally takes issue with the imposition of consecutive sentences in his two cases.

For reasons set forth below, we reverse and hold that mandatory lifetime postrelease supervision for juveniles who have committed and are later convicted of aggravated indecent liberties categorically constitutes cruel and unusual punishment. We also reverse the panel's holding that it did not have jurisdiction to consider the imposition of consecutive sentences in light of our decision in *State v. Looney*, 299 Kan. 903, 327 P.3d 425 (2014); however, we affirm the district court's imposition of consecutive sentences.

FACTUAL AND PROCEDURAL BACKGROUND

In 09CR3878, Dull was charged with burglary, a severity level 7 person felony, and misdemeanor theft. These offenses occurred on December 16, 2009, after Dull had turned 18 years old. In 10CR2224, Dull was charged with rape, a severity level 1 person felony, for having sexual intercourse with a 13-year-old girl on or between July 1, 2009, and July 31, 2009. Dull was 17 years old at the time of the alleged sex offense, but the district court authorized prosecution as an adult. The cases were consolidated, and, pursuant to a plea agreement, Dull pleaded guilty to the burglary and misdemeanor theft charges in 09CR3878 and to the amended charge of aggravated indecent liberties, a

5

severity level 3 person felony, in 10CR2224. Dull moved for durational and dispositional departures.

In 09CR3878, the district court denied the departure motion and sentenced Dull to a standard term of 24 months' imprisonment followed by 12 months' postrelease supervision for the burglary offense and a concurrent term of 12 months in county jail for the misdemeanor theft offense. In 10CR2224, the district court granted a downward durational departure from the presumptive standard sentence of 94 months' imprisonment to 45 months' imprisonment followed by lifetime postrelease supervision. The court reasoned that Dull's mental impairment caused him to lack substantial judgment when the crime was committed and the lack of participation by the victim in the proceedings resulted in less harm to the victim than typical for such an offense. The sentences in both cases were ordered to run consecutive to one another.

Dull argues for the first time on appeal that mandatory lifetime postrelease supervision categorically constitutes cruel and/or unusual punishment under the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights when it is imposed on juveniles who have committed and are later convicted of similar sex offenses. Additionally, he challenges the district court's imposition of consecutive sentences.

In a divided opinion, the Court of Appeals considered only the categorical challenge under the Eighth Amendment. Acknowledging it was a difficult call, the majority relied primarily on *State v. Mossman*, 294 Kan. 901, 930, 281 P.3d 153 (2012), and *State v. Cameron*, 294 Kan. 884, 898, 281 P.3d 143 (2012), which held that mandatory lifetime postrelease supervision for a first-time offender *adult* convicted of aggravated indecent liberties with a child or aggravated indecent solicitation of a child was constitutional under the Eighth Amendment. The *Mossman* and *Cameron* courts

6

applied the analysis set forth in *Graham v. Florida*, 560 U.S. 48, 66, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (life without parole for juveniles convicted of nonhomicide offenses is unconstitutional). The Court of Appeals majority also applied *Graham* in concluding that mandatory lifetime postrelease supervision for juveniles convicted of aggravated indecent liberties does not categorically constitute cruel and unusual punishment under the Eighth Amendment. *Dull*, 2013 WL 193036, at \*12.

Judge G. Joseph Pierron dissented reasoning that acts committed by juveniles should be viewed differently from acts committed by adults, and that the real possibility of a lifetime sentence for the later commission of a minor felony was not proportional. 2013 WL 193036, at \*13 (Pierron, J., dissenting).

The Court of Appeals unanimously agreed that it lacked jurisdiction to consider a challenge to the imposition of consecutive presumptive sentences. *Dull*, 2013 WL 193036, at \*12.

Dull petitioned for review of both issues. This court granted the petition pursuant to K.S.A. 20-3018(b) and K.S.A. 60-2101(b) (review of Court of Appeals' decisions upon timely petition for review).

DOES MANDATORY LIFETIME POSTRELEASE SUPERVISION FOR A SEX OFFENSE COMMITTED BY A JUVENILE VIOLATE THE EIGHTH AMENDMENT?

*Jurisdiction*

"Statutory interpretation and jurisdictional challenges involve questions of law subject to unlimited appellate review. [Citation omitted.]" *State v. Williams*, 298 Kan. 1075, 1079, 319 P.3d 528 (2014).

7

Before the Court of Appeals, the State argued that Dull's categorical challenge to his lifetime postrelease supervision was a "thinly-veiled attempt to challenge his individual sentence." Accordingly, the State argued the appellate court did not have jurisdiction to consider an appeal from a presumptive or downward departure sentence, including an individual challenge to the constitutionality of a sentence. See K.S.A. 21-4721; *State v. Huerta*, 291 Kan. 831, Syl. ¶ 3, 247 P.3d 1043 (2011) (constitutional infirmity not subject to direct appeal in individual presumptive case); *State v. Johnson*, 286 Kan. 824, 841-42, 190 P.3d 207 (2008) (if sentence scheme itself is not being challenged as constitutionally infirm, court lacks jurisdiction to consider individual presumptive sentence); *State v. Clemons*, 273 Kan. 328, 343-44, 45 P.3d 384 (2002) (no jurisdiction to consider whether individual presumptive sentence was cruel and unusual punishment).

The Court of Appeals rejected this argument, reasoning this court had not questioned jurisdiction in *Mossman* and had granted review and remanded two cases which had been dismissed for lack of jurisdiction. See *State v. Vanskiver*, No. 101,214, *order of dismissal filed* September 29, 2009, *rev. granted and remanded* September 13, 2010; and *State v. Collins*, No. 100,996, *order of dismissal filed* August 31, 2009, *rev. granted and remanded* June 23, 2010. Subsequently, this court determined that "a presumptive prison sentence does not render an appellate court without jurisdiction, under K.S.A. 21-4721(c)(1), to review the imposition of a lifetime postrelease supervision period." *Williams*, 298 Kan. at 1080.

Additionally, as discussed in the second issue, Dull's sentence for aggravated indecent liberties in this case was a departure sentence and this court has jurisdiction to consider an appeal pursuant to K.S.A. 21-4721(a) ("A departure sentence is subject to appeal by the defendant."); see also *State v. Looney*, 299 Kan. at 908 (statute makes no distinction between favorable and unfavorable departure). The State chose not to cross-

8

petition this ruling on jurisdiction, but this court has a duty to consider jurisdictional issues *sua sponte*. See *Williams*, 298 Kan. at 1080. Accordingly, we have jurisdiction to consider this issue.

*Preservation of Issue*

The Court of Appeals also considered whether Dull's attempt to bring a categorical challenge to his sentence under both the Eighth Amendment and § 9 of the Kansas Constitution Bill of Rights could be raised for the first time on appeal. The panel noted three exceptions to the general rule:

> "(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason. *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010)." *Dull*, 2013 WL 193036, at *2.

Applying *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010), the panel separated its analysis under the Eighth Amendment from its analysis under § 9 of the Kansas Constitution Bill of Rights. Additionally, it identified that challenges to proportionality under the Eighth Amendment are divided into two classifications: (1) the length of term-of-years sentences given all the circumstances in a particular case; and (2) categorical restrictions on the death penalty. This second classification also encompasses cases in which the court implements the proportionality standard based on certain categorical restrictions. See *State v. Ross*, 295 Kan. 424, 428, 284 P.3d 309 (2012).

As a challenge under the first classification is case-specific, which requires factual findings, it is precluded from being raised for the first time on appeal. See *Gomez*, 290 Kan. at 864-65. Likewise, a challenge under § 9 of the Kansas Constitution Bill of Rights

9

generally cannot be raised for the first time on appeal because of the factual inquiries involved. 290 Kan. at 867-68 (application of *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 [1978], factors in § 9 analysis involves both legal and factual inquiries).

The opposite is true under the second classification, a categorical proportionality challenge under the Eighth Amendment. After identifying the nature of the offense and the characteristics of the offender, the *Graham* Court applied a two-prong analysis in considering a categorical challenge under the Eighth Amendment. This analysis considers whether a national consensus against the sentencing practice exists and instructs the court to use its own independent judgment taking into account precedent and the Eighth Amendment. 560 U.S. at 61. As the factors assessed in a categorical proportionality challenge are not case specific and generally raise questions of law, a categorical proportionality challenge may be raised for the first time on appeal under certain circumstances. *Gomez*, 290 Kan. at 866. Accordingly, the panel correctly concluded that it could consider only Dull's Eighth Amendment categorical proportionality challenge involving only questions of law.

In his petition for review, Dull frames his issue as whether the lifetime postrelease supervision violates the Eighth Amendment and § 9 of the Kansas Bill of Rights, and he repeatedly refers to § 9. However, he does not challenge the panel's preservation rulings, and he narrows the issue in his petition as focusing on the *Graham* Court's "second classification."

"[I]ssues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals." Supreme Court Rule 8.03(h)(1) (2014 Kan. Ct. R. Annot. 80). This court will not consider issues not presented or fairly included in the petition. See Supreme Court Rule 8.03(a)(4)(c) (2014 Kan. Ct. R. Annot. 77). If a party fails to

10

challenge a dispositive procedural ruling in the petition for review, it is not properly before this court. See *State v. Allen*, 293 Kan. 793, 796, 268 P.3d 1198 (2012). Consequently, the only argument properly before this court is a categorical proportionality challenge under the Eighth Amendment.

*Standard of Review*

A categorical proportionality challenge under the Eighth Amendment implicates questions of law, and this court has unlimited review. See *Williams*, 298 Kan. at 1086; *Mossman*, 294 Kan. at 925. A constitutional challenge to the lifetime postrelease supervision portion of an aggravated indecent liberties with a child sentence "is an indirect attack on the constitutionality of the statute as applied." 294 Kan. at 906.

Deciding whether a statute is constitutional is a question of law subject to unlimited review. This court presumes statutes are constitutional and must resolve all doubts in favor of a statute's validity. "'A statute must clearly violate the constitution before it may be struck down' and an appellate court '"not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." [Citation omitted.]'" *State v. Gaona*, 293 Kan. 930, 958, 270 P.3d 1165 (2012) (quoting *State v. Johnson*, 286 Kan. 824, 842-43, 190 P.3d 207 [2008]).

*Analysis*

In the summer of 2009, Dull was 17 years old when he had sexual intercourse with a 13-year-old girl. He was charged with rape. The State's motion to prosecute him as an adult was granted by the district court pursuant to K.S.A. 2007 Supp. 38-2347, and he was tried an adult. Pursuant to plea negotiations, he pled guilty to the lower felony of aggravated indecent liberties with a child, but the conviction still qualified as a sexually

violent crime and subjected him to mandatory lifetime postrelease supervision. See K.S.A. 2014 Supp. 22-3717(d)(1)(G) ("Except as provided in subsection [u], persons convicted of a sexually violent crime committed on or after July 1, 2006, and who are released from prison, shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life."); K.S.A. 2014 Supp. 22-3717(d)(5)(C) (aggravated indecent liberties with a child is a sexually violent crime).

In his petition for review, Dull argues mandatory lifetime postrelease supervision for a sex offense that does not involve sexual penetration where the offender is less than 18 years old and the victim is 13 years old categorically constitutes cruel and unusual punishment under the Eighth Amendment. At oral argument, defense counsel reframed the argument as applicable to any juvenile convicted of aggravated indecent liberties with a child. Alternatively, Dull contends the imposition of a mandatory lifetime postrelease supervision sentence without the individualized sentencing discussed in *Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455, 2458, 183 L. Ed. 2d 407 (2012), is unconstitutional.

*Relevant Eighth Amendment Caselaw*

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "'The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense."'" *Mossman*, 294 Kan. at 921 (quoting *Graham*, 560 U.S. at 59). With this backdrop, a trio of United States Supreme Court cases has established that "children are constitutionally different from adults for sentencing purposes." *Miller*, 132 S. Ct. at 2464.

12

In the first case, *Roper v. Simmons*, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), the United States Supreme Court created a categorical ban on capital punishment for juvenile offenders who were younger than 18 years old. In reaching this conclusion, the Court first observed that the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where available; and the trending decline in practice demonstrated that society views juveniles, like the mentally retarded, as "'categorically less culpable than the average criminal.'" 543 U.S. at 567 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316, 122 S. Ct. 2242, 153 L. Ed. 2d 335 [2002]).

The *Roper* Court found that juveniles were *not* among the worst offenders deserving the death penalty for three reasons: (1) a lack of maturity and an underdeveloped sense of responsibility; (2) juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and (3) the character and personality traits of a juvenile are not as well formed as that of an adult. 543 U.S. at 569-70. The Court reasoned that once the diminished culpability of juveniles is recognized, it is evident that the penological justifications of retribution and deterrence for the death penalty apply to them with lesser force than to adults. 543 U.S. at 571.

Five years later in *Graham*, 17-year-old Graham violated his probation for armed burglary with assault or battery by participating in a home invasion and a burglary. The district court revoked his probation and imposed a sentence of life without the possibility of parole. On appeal, the *Graham* Court extended the categorical approach in *Roper* to cases involving life without the possibility of parole for juvenile offenders convicted of nonhomicide crimes. 560 U.S. at 68-69.

In analyzing the nature of the offense, the *Graham* Court referenced its finding that capital punishment is impermissible for nonhomicide crimes. Regarding the characteristics of the offender, the Court noted its adoption of categorical rules

13

prohibiting the death penalty for those less than 18 years old. 560 U.S. at 70-71. Turning to the national consensus, the Court observed that only six states banned juvenile life without the possibility of parole; however, the Court noted the sentence was rarely given. Additionally, "the fact that transfer and direct charging laws make life without parole possible for some juvenile nonhomicide offenders does not justify a judgment that many States intended to subject such offenders to life without parole sentences." 560 U.S. at 67.

In exercising its independent judgment, the *Graham* Court noted *Roper*'s conclusion that juveniles have lessened culpability and are thus less deserving of the most severe punishments. 560 U.S. at 68. It reasoned "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." 560 U.S. at 69.

The *Graham* Court also found life without the possibility of parole is an especially harsh punishment for a juvenile who will on average serve a longer sentence than an adult offender. 560 U.S. at 70. It continued that none of the goals of penal sanctions— retribution, deterrence, incapacitation, and rehabilitation—provided adequate justification for life without the possibility of parole. 560 U.S. at 71. Accordingly, the Court concluded that life without the possibility of parole for a nonhomicide juvenile offender was unconstitutional reasoning: "A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." 560 U.S. at 82.

Two years later in *Miller*, two 14-year-old juvenile offenders were convicted of homicide and received mandatory life without the possibility of parole. The *Miller* Court extended the reasoning of *Graham* and *Roper* that youth matters when sentencing juveniles to the harshest punishments. 132 S. Ct. at 2465. The Court observed that "none

14

of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." 132 S. Ct. at 2465.

Additionally, as *Graham* treats juvenile life sentences as analogous to capital punishment, the Court likewise extended another line of precedent requiring individualized sentencing. 132 S. Ct. at 2467. "[O]ur individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." 132 S. Ct. at 2475. Accordingly, the Court concluded the Eighth Amendment forbids *mandatory* life without parole sentences for juveniles convicted of homicide. 132 S. Ct. at 2469.

We have applied the analysis set forth in these three cases to various sex offenses in concluding that mandatory lifetime postrelease supervision under K.S.A. 2014 Supp. 22-3717(d)(1)(G) is not categorically disproportionate for *adult* sex offenders, nor is it cruel and unusual punishment under the Eighth Amendment to the United States Constitution. See, *e.g.*, *Williams*, 298 Kan. at 1089-90 (sexual exploitation of child); *Mossman*, 294 Kan. at 930 (aggravated indecent liberties with a child); *Cameron*, 294 Kan. at 898 (indecent solicitation of a child).

Additionally, the Court of Appeals has also found that prospective life incarceration upon commission of a new felony while on mandatory lifetime postrelease supervision constituted cruel and unusual punishment as applied to the defendant. See *State v. Proctor*, 47 Kan. App. 2d 889, 280 P.3d 839 (2012), *opinion on remand* No. 104,697, 2013 WL 6726286 (Kan. App. 2013) (unpublished opinion), *rev. denied* 299 Kan. __ (April 28, 2014). However, no Kansas cases have addressed whether mandatory lifetime postrelease supervision is unconstitutional when imposed on a juvenile offender, as in this case.

15

*Subcategories of Categorical Proportionality Challenges*

The second classification of an Eighth Amendment challenge to a term-of-years sentence as disproportionate and therefore cruel and unusual encompasses cases in which the court implements the proportionality standard based on certain categorical restrictions. *Ross*, 295 Kan. at 428. We have outlined three subcategories of categorical proportionality challenges:

> "The United States Supreme Court identifies three subcategories of categorical proportionality challenges. The first considers the nature of the offense, such as a prohibition on capital punishment for nonhomicide crimes against individuals. *Graham*, 560 U.S. at 60-61 (citing *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 [1982]). The second considers the characteristics of the offender, such as a categorical rule prohibiting the death penalty for juveniles. *Graham*, 560 U.S. at 61, (citing *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005]). The third, which was first recognized in *Graham*, combines the two because it 'implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes.' 560 U.S. at 61." *Williams*, 298 Kan. at 1086.

In *Mossman*, the defendant was convicted of aggravated indecent liberties with a child and argued his categorical challenge should be limited to first-time offenders involving sex with a child who is 14 or 15 without any element of force, coercion, prostitution, or pornography. This court rejected his attempt to limit the range of crimes, ruling it was so case specific as to "obliterate the distinction" between categorical and case-specific challenges. *State v. Mossman*, 294 Kan. 901, 928, 281 P.3d 153 (2012). Accordingly, we found the nature of the offense was limited to the crime itself—aggravated indecent liberties with a child. 294 Kan. at 928. However, we recognized the category of "first-time sex offenders" as a class of offenders. 294 Kan. at 928-29; see also *State v. Cameron*, 294 Kan. 884, 896-97, 281 P.3d 143 (2012) (rejecting attempt to define

aggravated indecent solicitation of a child category as a sex offense not involving pornography where the offender and victim do not engage in physical or sexual contact).

As noted above, defense counsel conceded at oral argument that *Mossman* and *Cameron* control the classification of the nature of the offense to the crime of conviction: aggravated indecent liberties with a child. However, the offenders in *Mossman* and *Cameron* were adults, and the United States Supreme Court has made it clear that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 132 S. Ct. at 2464. Dull's status as a juvenile is thus a relevant characteristic to defining a class of offenders. See *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (categorical ban on life without parole for nonhomicide juvenile offenders); *Roper*, 543 U.S. at 578-79 (categorical ban on capital punishment for juvenile offenders); *Miller*, 132 S. Ct. at 2464 (ban on mandatory life without parole for homicide juvenile offenders). We agree with the panel's conclusion that our analysis must be whether mandatory lifetime postrelease supervision constitutes cruel and/or unusual punishment when imposed on the category of juveniles who committed and were later convicted of aggravated indecent liberties with a child.

Graham*'s Two-Prong Analysis*

The *Graham* Court applied a two-prong analysis in considering a categorical challenge under the Eighth Amendment:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation omitted.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation omitted], the Court must determine in the exercise of its own independent

17

judgment whether the punishment in question violates the Constitution." *Graham*, 560 U.S. at 61.

### 1. *Objective Indicia of Society's Standards*

After identifying the applicable category, the *Mossman* and *Cameron* courts applied the first step of the *Graham* analysis, *i.e.*, whether objective indicia of society's standards, as expressed in legislative enactments and state practices, demonstrate a national consensus against the sentencing practice at issue. *Mossman*, 294 Kan. at 929; *Cameron*, 294 Kan. at 897. In *Mossman*, we relied on the Ninth Circuit Court of Appeals' analysis in finding lifetime supervised release for child pornography was not cruel and unusual punishment in *United States v. Williams*, 636 F.3d 1229, 1233-34 (9th Cir.), *cert. denied* 132 S. Ct. 188 (2011):

> "'Here, "objective indicia" suggest that society is comfortable with lifetime sentences of supervised release for sex offenders, as such sentences are common. According to the United States Sentencing Commission, in the last five years, federal courts have sentenced 1875 defendants convicted of child pornography and child prostitution crimes to lifetime supervised release. See U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 58-59 (July 2010), www.ussc.gov/general/20100722 _Supervised_Release.pdf. By way of comparison, in banning the sentence of life without parole for juvenile nonhomicide offenders, the Supreme Court noted that there were then just 123 people in the county serving such sentences. See *Graham*, 130 S. Ct. at 2024. Further, the percentage of federal sex offenders receiving life terms of supervised release is increasing, climbing from 9.3 percent in 2005, to 20.5 percent in 2009. [Citations omitted.]'" *Mossman*, 294 Kan. at 929-30.

The *Mossman* court looked at other states' legislative enactments concerning variations of lifetime postrelease supervision of sex offenders:

"[A]t least three states—Colorado, Nebraska, and Oklahoma—mandate lifetime postrelease supervision for classes of offenses similar to Mossman's Kansas offense. See Colo. Rev. Stat. § 18-1.3-1001 (2011) ('a program under which sex offenders may receive treatment and supervision for the rest of their lives, if necessary, is necessary for the safety, health, and welfare of the state'); Neb. Rev. Stat. §§ 83-174.03, 28-319.01 (2008) (lifetime supervision upon completion of incarceration for 'registrable' sex offenses, which includes sexual assault of a child in the first degree); Okla. Stat. Ann. tit. 22, § 991a(A)(13) (2011) (supervision for period correlating with obligation to register as a sex offender); Okla. Stat. Ann. tit 57, § 584(N)(2) (2011) (registration for certain crimes required for lifetime).

"At least one other state—Arizona—permits but does not mandate lifetime postrelease supervision for a similar offense. Ariz. Rev. Stat. Ann. § 13-902(E) (2006) (permitting lifetime probation for sexual offenses). . . .

. . . .

"[I]t seems fair to say that less than half of states provide for lifetime postrelease supervision of some or all sex offenders and, because several states have a mechanism for termination of the postrelease supervision under certain conditions, only a handful of states impose punishment as absolute as Kansas' requirement. Nevertheless, Kansas is not alone in imposing mandatory lifetime postrelease supervision for crimes such as Mossman's, and we are not aware of any court that has found lifetime postrelease supervision of a violent sex offender to be cruel and unusual punishment." 294 Kan. at 917-20.

But *Mossman* addressed mandatory lifetime postrelease supervision for sex offenses committed by *adults*, not juveniles. Dull notes that 18 states impose mandatory lifetime postrelease supervision for at least some convicted sex offenders. But see *Commonwealth v. Cole*, 468 Mass. 294, 310-11, 10 N.E.3d 1081 (2014) (community parole supervision statute authorizing its parole board to impose mandatory sentences is

unconstitutional). He points to three states which require the offender to be over 18 years old when imposing lifetime parole or supervision.

> "See Ind. Code §§ 35-50-6-1(e), 35-38-1-7.5 (2012) (lifetime supervision for 'sexually violent predators,' defined as those committing certain crimes when at least 18 years old); Mont. Code Ann. § 45-5-625(4) (2012) (lifetime supervision for offenders convicted of sexual abuse of children where child was 12 or younger and offender was 18 or older); Or. Rev. Stat. § 144.103(2) (2012) (lifetime supervision for offenders convicted of certain sex crimes who were at least 18 years old at the time of the offense)." *State v. Dull*, No. 106,437, 2013 WL 193036, at *9 (Kan. App. 2013) (unpublished opinion).

The Court of Appeals identified two states that apply lifetime supervision to sex offenders less than 18 years of age:

> "See Colo. Rev. Stat §§ 18-1.3-1001, 18-1.3-1003(5)(a)(IV), 18-1.3-1009, 18-3-405 (2012) (lifetime supervision, with possibility of discharge, for certain sex offenders, including those convicted of sexual assault on a child where the child was under 15 and the offender was at least 4 years older than the child); Nev. Rev. Stat. §§ 176.0931, 201.230 (2011) (lifetime supervision, with possibility of discharge, for offenders of any age convicted of lewdness with child under 14)." *Dull*, 2013 WL 193036, at *9.

In this case, the Court of Appeals majority found it was unclear whether the fact that only a small number of states impose lifetime postrelease supervision on juveniles convicted of sex offenses reflects a true national consensus against the sentencing practice or whether it reflects the diverse manner in which states define and punish sex offenses against children. Accordingly, it concluded Dull had not shown a national consensus against sentencing juveniles convicted of similar sex offenses to mandatory lifetime postrelease supervision. *Dull*, 2013 WL 193036, at *9.

20

Dull argues the fact that only three states specifically list an age over 18 years in their postrelease supervision statutes issue is not determinative. He contends the *Miller* Court expressly rejected a "counting-type analysis" and did not rely upon a lack of a national consensus in its analysis of whether a life without the possibility of parole sentence for a juvenile was cruel and unusual punishment. Indeed, the *Miller* Court was not dissuaded by the fact that 29 states had mandatory life without the possibility of parole sentences for homicide juvenile offenders, finding its case was "different from the typical one in which we have tallied legislative enactments," observing that its decision did not categorically bar a penalty for a class of offenders or type of crime; rather, "it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 132 S. Ct. at 2471.

While almost all jurisdictions permit juveniles to be tried as an adult in homicide cases, most jurisdictions do not have a separate penalty provision for juvenile offenders. See 132 S. Ct. at 2473. The *Miller* Court observed that when sentencing a juvenile to death or life without the possibility of parole, most jurisdictions use two separate statutory provisions: "One allowed the transfer of certain juvenile offenders to adult court, while another (often in a far-removed part of the code) set out the penalties for any and all individuals tried there." 132 S. Ct. at 2472. The Court reasoned "it was impossible to say whether a legislature had endorsed a given penalty for children (or would do so if presented with the choice)." 132 S. Ct. at 2472.

Observing that half of the jurisdictions imposed life without the possibility of parole on juveniles without regard to age, the majority concluded: "[The States] can count to 29 by including these possibly (or probably) inadvertent legislative outcomes does not preclude our determination that mandatory life without parole for juveniles violates the Eighth Amendment." 132 S. Ct. at 2473.

21

Dull argues that likewise in Kansas, the last time age is considered concerning juveniles is when they are to be tried as an adult. See K.S.A. 2014 Supp. 38-2347. Dull's age was a factor when he was sentenced pursuant to K.S.A. 21-3504(a)(3)(A), a severity level 3 felony, rather than K.S.A. 21-3504(c), an off grid felony for offenders 18 years of age or older. However, Dull is correct that a separate section of the criminal procedure code imposes lifetime postrelease supervision without regard to age. See K.S.A. 2014 Supp. 22-3717(d)(1)(G).

Dull implies that it is difficult to ascertain a true national consensus when the legislatures are not directly addressing the age of the offender. Indeed in *Mossman*, when addressing national consensus, we were not dissuaded by the fact that only a handful of states had a sentencing provision for mandatory lifetime postrelease supervision for adults similar to Kansas. 294 Kan. at 920-21.

As there is great diversity in the manner of sentencing juveniles for sex crimes among the states, it is helpful if we expand the national consensus analysis to "mandatory minimum" sentences for juveniles. The Iowa Supreme Court recently made some interesting observations under this factor:

> "[W]e recognize no other court in the nation has held that its constitution or the Federal Constitution prohibits a statutory schema that prescribes a mandatory minimum sentence for a juvenile offender. Further, most states permit or require some or all juvenile offenders to be given mandatory minimum sentences. *See* Martin Guggenheim, *Graham v. Florida and a Juvenile's Right to Age—Appropriate Sentencing*, 47 Harv. C.R.-C.L. L. Rev. 457, 494 & n.267 (2012) [hereinafter Guggenheim] (collecting state statute permitting or requiring a mandatory minimum sentences to be imposed on a juvenile offender tried as an adult). This state of the law arguably projects a consensus in society in favor of permitting juveniles to be given mandatory minimum statutory sentences. *See* Alex Dutton, Comment, *The Next Frontier of Juvenile Sentencing Reform: Enforcing Miller's Individualized Sentencing Requirement Beyond the JLWOP Context*, 23 Temp.

22

Pol. & Civ. Rts. L. Rev. 173, 195 (2013) [hereinafter Dutton] ('At this moment, no such national consensus exists against the imposition of mandatory sentences on juvenile offenders; the practice is common across jurisdictions.').

"Yet, '[c]onsensus is not dispositive.' *Kennedy*, 554 U.S. at 421, 128 S. Ct. at 2650, 171 L. Ed. 2d at 539. Moreover, as *Miller* demonstrates, constitutional protection for the rights of juveniles in sentencing for the most serious crimes is rapidly evolving in the face of widespread sentencing statutes and practices to the contrary. *See* 567 U.S. at ___, 132 S. Ct. at 2470-73, 171 L. Ed. 2d at 539 (rejecting an argument by Alabama and Arkansas that widespread use of mandatory-life-without-parole sentences for juvenile homicide offenders precluded holding the practice to be unconstitutional). Additionally, the evolution of society that gives rise to change over time necessarily occurs in the presence of an existing consensus, as history has repeatedly shown. The 'tough on crime' movement in politics may have made mandatory minimum sentences for juveniles common in society, *see* Dutton, 23 Temp. Pol. & Civ. Rts. L. Rev. at 175 (identifying 'conservative, tough-on-crime political campaigns' as one cause of harsh and longer juvenile sentences); *see also* William J. Stuntz, *The Pathological Politics of Criminal Law,* 100 Mich. L. Rev. 505, 509 (2001) (describing the bipartisan 'bidding war' to be toughest on crime), but, the shift has also given rise to the claim that some sentencing laws have gone too far as applied to youthful offenders, *cf.* Guggenheim, 47 Harv. C.R.-C.L. L. Rev. at 495 (arguing the national-consensus analysis is inadequate to protect juvenile rights)." *State v. Lyle*, 854 N.W.2d 378, 386-87 (Iowa 2014).

However, we recently found the imposition of a hard 20 mandatory minimum sentence on a juvenile was constitutional under *Graham* and *Miller*. See *State v. Brown*, 300 Kan. 542, 564, 331 P.3d 781 (2014).

In summary, Dull notes that 18 states impose mandatory lifetime postrelease supervision for at least some convicted sex offenders. Like Kansas, the states of Colorado, Nebraska, and Oklahoma mandate lifetime postrelease supervision to be imposed on juveniles convicted of offenses similar to aggravated indecent liberties with a

child, and it is discretionary in Arizona. Colorado specifically references the juvenile's age in the statute providing for mandatory lifetime postrelease supervision. Indiana, Montana, and Oregon do not permit mandatory lifetime postrelease supervision to be imposed on a juvenile. See *Dull*, 2013 WL 193036, at *9. The majority of states, including Kansas, have adopted mandatory minimum sentencing for juveniles. Taking into account caselaw and legislative enactments, Dull has not demonstrated a national consensus against sentencing juveniles to mandatory lifetime postrelease supervision or against mandatory minimum sentences. However, application of adult mandatory sentencing statutes to juveniles skews the analysis—along with the changing landscape of juvenile sentencing in the wake of *Roper*, *Miller*, and *Graham.*

2. *Court's Own Independent Judgment*

Under the second step of the *Graham* analysis, this court exercises its own independent judgment to determine whether the sentencing practice violates the Eighth Amendment:

> "'Community consensus, while "entitled to great weight," is not itself determinative of whether a punishment is cruel and unusual. [Citation omitted.] In accordance with the constitutional design, "the task of interpreting the Eighth Amendment remains our responsibility." [Citation omitted.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. [Citations omitted.] In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. [Citations omitted.]'"
> *Mossman*, 294 Kan. at 929 (quoting *Graham*, 560 U.S. at 67).

A. *Culpability*

In *Miller*, the United States Supreme Court summed up its observations regarding the diminished culpability of juveniles:

"*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' *Graham*, [560 U.S. at 68]. Those cases relied on three significant gaps between juveniles and adults. First, children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S. at 569. Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [543 U.S. at 570].

"Our decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well. [543 U.S. at 569]. In *Roper,* we cited studies showing that '"[o]nly a relatively small proportion of adolescents"' who engage in illegal activity '"develop entrenched patterns of problem behavior."' [543 U.S. at 570] (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence:  Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 [2003]). And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' [560 U.S. at 68]. We reasoned that those findings— of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his '"deficiencies will be reformed."' [560 U.S. at 68-69] (quoting *Roper*, 543 U.S. at 570)." *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2464-65, 183 L. Ed. 2d 407 (2012).

This court has likewise recognized the diminished culpability of juveniles as set forth in *Roper* and *Graham*:

> "In looking at the culpability of the offender, the Court noted that in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), it reasoned that because juveniles have a lessened culpability, they are less deserving of the most severe punishments. In *Roper*, the Court stated that compared to adults, juveniles have a '"lack of maturity and an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters 'are not as well formed.' *Roper*, 543 U.S. at 569-70. Given these salient characteristics, the *Roper* Court noted that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' 543 U.S. at 573. Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' 543 U.S. at 569. Based on these statements from *Roper*, the *Graham* Court concluded that '[a] juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." [Citation omitted.]' *Graham*, 130 S. Ct. at 2026." *State v. Ruggles*, 297 Kan. 675, 682, 304 P.3d 338 (2013).

Similarly, our Court of Appeals has recognized the legislature's intention to hold juveniles less accountable for their actions. See *State v. Ussery*, 34 Kan. App. 2d 250, 257, 116 P.3d 735, *rev. denied* 280 Kan. 991 (2005) ("The Kansas Legislature has deemed it proper to hold persons under the age of 18 *less* accountable for their criminal conduct than those who have attained the age of 18. Consequently, the legislature has prescribed lesser penalties for those who commit serious offenses as juveniles.").

Thus, both United States Supreme Court and Kansas caselaw suggest that 17-year-old Dull had a diminished moral culpability when he committed the crime of aggravated

indecent liberties with a child. See *Graham*, 560 U.S. at 50 ("[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.").

## B. *Severity of the Punishment*

"'Postrelease supervision' means the release of a prisoner to the community after having served a period of imprisonment or equivalent time served in a facility where credit for time served is awarded as set forth by the court, subject to conditions imposed by the Prisoner review board and to the secretary of correction's supervision." K.S.A. 2014 Supp. 21-6803(p).

The panel correctly acknowledges that mandatory lifetime postrelease supervision is a severe sanction in Kansas, and mandatory lifetime postrelease supervision "is undeniably part of a defendant's sentence." *State v. Mossman*, 294 Kan. 901, 907, 281 P.3d 153 (2012); see K.S.A. 2010 Supp. 21-4704(e)(2) ("In presumptive imprisonment cases, the sentencing court shall pronounce the complete sentence which shall include . . . the period of postrelease supervision.").

"Mandatory lifetime postrelease supervision includes a general requirement that the person cannot commit a new criminal offense and may include several other specific 'conditions targeted toward facilitating rehabilitation, restitution, and safe reintegration into society. [Citation omitted.]' *State v. Gaudina*, 284 Kan. 354, 359, 160 P.3d 854 (2007). These conditions may include payment of costs, fines, and restitution; completing educational requirements; performing community service; reporting to a supervising officer; and abiding by other special conditions allowed by administrative regulations and orders. K.S.A. 21-4703(p) (defining 'postrelease supervision'); K.S.A. 22-3717(m) (listing possible conditions)." *Mossman*, 294 Kan. at 904.

"[W]hile the sentence is lengthy, lifetime postrelease supervision is not as harsh a punishment as imprisonment and is aimed at safely integrating a sex offender into society and protecting the public." *State v. Cameron*, 294 Kan. 884, 896, 281 P.3d 143 (2012). However, "Kansas' provision [mandatory lifetime postrelease supervision] is more severe than most other jurisdictions." *Mossman*, 294 Kan. at 920. The Kansas Department of Corrections website lists the following current conditions of postrelease supervision:

> **"Standard Conditions of Post-release Supervision**
>
> "1. Reporting and Travel:  Upon release from the institution, the offender must agree to report as directed to the assigned parole officer and follow his/her instructions in reporting on a regular basis and keep the officer continuously informed of the offender's residence and employment. If it becomes necessary that the offender travel outside of the offender's assigned parole district (as determined by the parole officer) or the State of Kansas, the offender will obtain advance permission from his/her parole officer.
>
> "2. Laws:  The offender shall obey all federal and state laws, municipal or county ordinances, including the Kansas Violent Offender Registration Act. If the Kansas Offender Registration Act is applicable, the offender will register with the local Sheriff's Office within 3 days of arrival in the county of residence upon moving to any other county in Kansas. Changes in residence within the same county require written notification to the Sheriff's Office. If the offender is arrested for any reason, the offender will notify his/her parole officer at the earliest allowable opportunity.
>
> "3. Weapons:  An offender will not own, possess, purchase, receive, sell or transport any firearms, ammunition or explosive device, or any device designed to expel or hurl a projectile capable of causing injury to persons or property, any instrument or tool used with the intent to cause harm, or any weapon prohibited by law.
>
> "4. Personal conduct:  An offender will not engage in assaultive activities, violence, or threats of violence of any kind, threatening or intimidating behaviors, or lewd and lascivious behaviors.
>
> "5. Narcotics/Alcohol:  An offender will not illegally possess, use or traffic in any controlled substances, narcotics or other drugs as defined by law except as prescribed by a licensed medical practitioner. The offender will not consume any mind-altering substances, and agrees and consents to submit to a blood, breathalyzer or urine test at the

28

direction of the parole officer. At no time will the offender consume intoxicating liquor, including beer or wine, without written permission from his/her parole officer. At no time will an offender become intoxicated from the consumption of any substance, including, but not limited to, wine, beer, glue or paint.

"6. Association: An offender will not associate with persons engaged in illegal activity and will obtain written permission from the parole officer and institutional director to visit or correspond with inmates of any correctional institution.

"7. Employment: The offender agrees to secure and maintain reasonable, steady employment within 45 days of release from prison or residential treatment unless excused for medical reasons or an extension of time is given by his/her parole officer. The offender agrees to notify his/her employer of current and prior (non-expunged) adult felony convictions and status as an offender.

"8. Education: The offender agrees to make progress toward or successfully complete the equivalent of a secondary education if the offender has not completed such by the time of the offender's release and are deemed capable, as determined by their parole officer.

"9. Costs: The offender agrees to pay restitution, court costs, supervision fees and other costs as directed by the offender's parole officer.

"10. Treatment/Counseling: The offender agrees to comply with any relapse prevention plan and the recommendations of any treatment or counseling, or assessment program which is completed during the offender's incarceration or while under supervision. The offender agrees to follow any directives given to the offender by the offender's parole officer regarding evaluations, placement and/or referrals. The offender agrees to submit to polygraph examinations as directed by the offender's parole officer and/or treatment provider.

"11. Victim: The offender agrees to have no contact with the victim(s) in the offender's case(s) or the victim's family by any means including, but not limited to, in person, by phone, via computer, in writing or through a third party without the advance permission of the offender's parole officer.

"12. Search: The offender agrees to be subjected to a search of his/her person, residence, and any other property under his/her control by parole officers, authorized parole staff, and department of corrections enforcement, apprehension and investigation officers with or without a search warrant and with or without cause and by any law

enforcement officer based on reasonable suspicion of violation of conditions of post-incarceration supervision, or reasonable suspicion of criminal activity.

"If the offender is released to an out-of-state detainer and is subsequently released from incarceration for any reason, the offender must immediately contact the Kansas Department of Corrections, Parole Interstate Compact Office and provide information as to the offender's current status including residence and employment. If the offender is released to an in-state detainer and is subsequently released from local incarceration for any reason, the offender must notify the parole officer in the county which holds the detainer as well as the parole office on the offender's parole plan.

"Special Conditions:  The offender must agree to abide by the special condition(s) set forth, as well as to comply with instructions which may be given or conditions imposed by the offender's parole officer from time to time as may be governed by the special requirements of the offender's situation."

http://www.doc.ks.gov/prb/conditions

While the postrelease conditions are not confinement per se, they do restrain one's freedom with significant restrictions and limitations. See *Miller v. State*, 200 Kan. 700, 703-04, 438 P.2d 87 (1968) (order of probation imposes significant limitations on liberty of actions and constitutes restraint upon freedom sufficient to be entitled to K.S.A. 60-1507 action for relief); see also *Mossman*, 294 Kan. at 931 (Johnson, J., dissenting) ("With lifetime postrelease supervision, [the defendant] will not experience another day of freedom the rest of his life. The government can control what he does and where he goes for the next 40, 50, perhaps even 60 or 70 years."). Stated another way, mandatory lifetime postrelease supervision is a sentence that restricts the juvenile's liberty for life without any chance, hope, or legal mechanism of having those restrictions lifted or even reduced.

Once he is released from prison and placed on lifetime postrelease supervision, Dull must register with and report to the local sheriff as directed; he must report to his parole officer as directed; he must undergo a polygraph examination anytime his parole

30

officer directs; he must pay his supervision costs and other costs as directed by his parole officer; he must submit to any and all searches of his residence, automobile, and personal effects by his parole officer; he must not travel outside the state unless he has permission from his parole officer; he must not drink a glass of beer or other alcoholic beverage unless he has permission from his parole officer; and he must not hunt with a firearm. Additionally, the parole officer reserves the right to add or alter the conditions of the supervision from "time to time." See http://www.doc.ks.gov/prb/conditions; see also K.A.R. 44-9-501 (2014 Supp.) (new conditions may be established or modified following violation of postrelease supervision).

We note that revocation of lifetime postrelease supervision may result in further incarceration up to a lifetime sentence without the possibility of parole. See K.S.A. 2009 Supp. 75-5217(c) ("If the violation results from a conviction for a new felony, upon revocation, *the inmate shall serve the entire remaining balance of the period of postrelease supervision* even if the new conviction did not result in the imposition of a new term of imprisonment." [Emphasis added.]); K.S.A. 2014 Supp. 75-5217(c) ("the *inmate shall serve a period of confinement, to be determined by the prisoner review board, which shall not exceed the remaining balance of the period of postrelease supervision*" [emphasis added]). However, we do not base today's decision on this possible consequence. Compare *State v. Proctor*, No. 104,697, 2013 WL 6726286 (Kan. App. 2013) (unpublished opinion).

C. *Service of Legitimate Penological Goals*

"In exercising 'independent judgment,' the Supreme Court has instructed lower courts to 'consider whether the challenged sentencing practice serves legitimate penological goals.'" *United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir.), *cert. denied* 132 S. Ct. 188 (2011) (quoting *Graham v. Florida*, 560 U.S. 48, 67, 130 S. Ct.

31

2011, 176 L. Ed. 2d 825 [2010]). We have observed the following penological goals of mandatory lifetime postrelease supervision for adult offenders:

> "'Rehabilitation and incapacitation are central purposes of the criminal justice system, and they are particularly critical here given the propensity of sex offenders to strike again. Supervised release can further the end of rehabilitating sex offenders. For instance, in this case, the express conditions of supervised release will require Williams to receive sex offender treatment and to avoid situations where he may be tempted to offend again. Relatedly, supervised release helps incapacitate sex offenders by keeping them under the watchful eye of probation officers who may be able to detect problems before they result in irreparable harm to innocent children.'" *State v. Williams*, 298 Kan. 1075, 1089, 319 P.3d 528 (2014) (quoting 636 F.3d at 1234).

Moreover, "[a] life term of supervised release is particularly appropriate for sex offenders given their high rate of recidivism. See H.R. Conf. Rep. No. 107-527, at 2, 2002 WL 1376222, at 1 (noting that 'sex offenders are four times more likely than other violent criminals to recommit their crimes,' and that their 'recidivism rate [does] not appreciably decline as offenders age.')." *Williams*, 636 F.3d at 1233.

The *Mossman* court extended this analysis to Kansas offenders:

> "The Ninth Circuit's conclusion applies equally to those sentenced in Kansas to postrelease supervision for the crime of aggravated indecent liberties with a child. Further, although Williams was a repeat sex offender rather than a first-time sex offender like Mossman, some of the penological objectives for lifetime postrelease supervision— particularly deterrence, incapacitation, and rehabilitation—are the same whether the offender has committed one or many offenses. Accordingly, we conclude the analysis is persuasive as to both the classification of the crime and its application to the class of first-time sex offenders, especially when we factor in other states' acceptance of lifetime postrelease supervision when an offender has committed a similar crime." 294 Kan. at 930.

As these cases do not address the penological goals of mandatory lifetime postrelease supervision for juvenile offenders, we look to the penological goals of life without the possibility of parole articulated in *Graham* for guidance. The *Graham* Court reasoned that retribution does not justify imposing the second most severe penalty on the less culpable juvenile nonhomicide offender. Likewise deterrence is not a justification because juveniles are less likely to take a possible punishment into consideration when making decisions based on their immaturity, irresponsibility, impetuousness, and ill-considered decision making. Regarding incapacitation, the determination that a youth will forever be a danger to society is difficult to make, and a life without parole denies the juvenile offender a chance to demonstrate growth and maturity. Finally, the goal of rehabilitation is not met because an irrevocable judgment about the juvenile's value and place in society is inappropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability. *Graham v. Florida*, 560 U.S. 48, 73-74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

The *Miller* Court likewise discussed penological justifications related to youth sentenced to life without the possibility of parole:

> "[Previous cases] emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because '"[t]he heart of the retribution rationale"' relates to an offender's blameworthiness, '"the case for retribution is not quite as strong with a minor as with an adult."' [Citations omitted.] Nor can deterrence do the work in this context, because '"the same characteristics that render juveniles less culpable than adults"'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. [Citations omitted.] Similarly, incapacitation could not support the life-without-parole sentence in *Graham:* Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but '"incorrigibility is inconsistent with youth."' [Citations omitted.] And

33

for the same reason, rehabilitation could not justify that sentence. Life without parole 'forswears altogether the rehabilitative ideal.' [Citation omitted.] It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change. [Citation omitted.]

. . . .

"Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. [Citation omitted.] 'An offender's age,' we made clear in *Graham,* 'is relevant to the Eighth Amendment,' and so 'criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.' [Citation omitted.]" *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2465-66, 183 L. Ed. 2d 407 (2012).

Although these cases were not addressing an aggravated indecent liberties with a child conviction, "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is *crime specific*." (Emphasis added.) 132 S. Ct. at 2465.

In this case, the majority noted the *Mossman* court's discussion of the high and frightening risk of recidivism posed by sex offenders, and it held these concerns were "just as significant when a 17-year-old offender commits a sexually violent crime as when an 18-year-old commits the same crime." *Dull*, 2013 WL 193036, at *11 (citing 294 Kan. at 910). However, "[s]everal recent longitudinal studies, examining data on more than 33,000 juvenile sex offenders, reinforce the clinical consensus that juvenile sex offenders present low recidivism risks." Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. 1, 13 (December 2013). Similarly, the Iowa Supreme Court recently observed:

34

"Research has confirmed that juvenile sex offenders generally 'are less likely to re-offend than adults, especially when they receive appropriate treatment.' Fed. Advisory Comm. on Juvenile Justice, *Annual Recommendations Report to the President and Congress of the United States* 7-8 (2007), *available at* www.facjj.org/annual/reports/ ccFACJJ%20Report%20508.pdf. Most juveniles who become involved in illegal sexual behavior 'are not sexual predators and do not meet the accepted criteria for pedophilia.' *Id.; see also* Britney M. Bowater, *Adam Walsh Child Protection and Safety Act of 2006: Is There a Better Way to Tailor the Sentences of Juvenile Sex Offenders?*, 57 Cath. U. L. Rev. 817, 840 (2008) ('[M]any studies indicate that juvenile sex offenders have a lower recidivism rate than adult sex offenders.')." *In re A.J.M.*, 847 N.W.2d 601, 605 (Iowa 2014).

By way of comparison in assessing penological goals, Professor Amy Halbrook opines that the same analysis that the Supreme Court applied to juvenile death penalty and life-without-parole cases should be applied when assessing whether a juvenile should be required to register as a sex offender for life without the possibility for meaningful review:

"Applying mandatory lifetime registration to juveniles does not serve any penological goal. Juvenile status undermines the justifications behind each goal because of a youth's developmental limitations. Because of a youth's diminished culpability, any argument for retribution is less compelling for a youth than it would be for an adult. Lack of maturity undermines the goal of deterrence; juveniles act recklessly and are less likely than adults to consider potential punishments before committing crimes. In addition, by imposing restrictions and community notification, sex offender schemes undermine rehabilitation and create barriers for youth to participate fully in society. The punishment is excessively punitive because of the emotional and social toll; the shaming; the isolation it creates by restricting housing, employment, and family life; and the fact that the requirement remains in place despite the fact that juveniles are amenable to treatment and may, at some point, no longer pose any risk to the community." Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. at 51.

The penological purposes for applying mandatory lifetime postrelease supervision to a juvenile sex offender are thus not as applicable as they were to the adult offenders in *Mossman*, *Williams*, and *Cameron*. First, "[r]etribution, which relates to a defendant's blameworthiness, is less compelling in light of a juvenile's lesser culpability," *Dull*, 2013 WL 193036, at *11, and no showing was made that mandatory lifetime postrelease supervision "is not grossly disproportionate in light of the justification offered." *Graham*, 560 U.S. at 72. Second, the deterrent effect of mandatory lifetime postrelease supervision only works if the offender refrains from negative actions based on potential consequences; however, juveniles lack the ability to take the requisite step back, analyze their actions, recognize the consequences, and choose a different course of action. 560 U.S. at 72.

Finally, while we have held the goals of rehabilitation and incapacitation are served by the imposition of mandatory lifetime postrelease supervision on adult offenders given their propensity to strike again, juveniles have a lower risk of recidivism. Placing lifetime restraints on a juvenile offender's liberties requires a determination that the juvenile will forever be a danger to society and "forswears altogether the rehabilitative ideal." 560 U.S. at 74.

*Application of* Graham *Two-Prong Analysis*

Under *Graham*, Dull has not demonstrated a national consensus for or against mandatory lifetime postrelease supervision for juveniles. Juveniles, especially those who commit a nonhomicide offense, are clearly viewed with a diminished moral culpability compared to adults. See *Graham*, 560 U.S. at 68. Mandatory lifetime postrelease supervision for a juvenile is a severe lifetime sentence, even when the potential for further imprisonment is not considered, because the juvenile's liberty interests are

36

severely restricted for life by the terms of the mandatory lifetime postrelease supervision. While we have found mandatory lifetime postrelease supervision constitutional for adults, the same factors that result in a diminished culpability for juveniles, *i.e.*, recklessness, immaturity, irresponsibility, impetuousness, and ill-considered decision making, along with their lower risks of recidivism, all diminish the penological goals of lifetime supervision for juvenile sex offenders.

Accordingly, we reverse the Court of Appeals and conclude that mandatory lifetime postrelease supervision is categorically unconstitutional under *Graham* when imposed on a juvenile who committed and was later convicted of aggravated indecent liberties with a child. Our decision on this issue eliminates the need to consider Dull's alternative argument concerning individualized sentencing.

The mandatory lifetime postrelease supervision portion of Dull's sentence is therefore vacated. K.S.A. 21-4720(b)(7) provides that in consecutive sentencing cases, "[i]f the sentence for the consecutive sentences is a prison term, the postrelease supervision term is a term of postrelease supervision as established for the *primary* crime." (Emphasis added.) Referring back to K.S.A. 21-4720(b)(2), "[t]he primary crime is the crime with the highest crime severity ranking," which in this case remains aggravated indecent liberties with a child, a severity level 3 felony. In light of our holding, the district court cannot impose any term of postrelease supervision in this case on remand for resentencing. See *State v. Kessler*, 276 Kan. 202, 217, 73 P.3d 761 (2003) (where district court's authority to impose sentence is controlled by statutory procedure found unconstitutional, district court has no authority to impose such sentence).

*Jurisdiction*

"Whether appellate jurisdiction exists is a question of law over which this court exercises unlimited review." *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014).

Dull argues the district court abused its discretion by ordering the sentences in his two cases to run consecutively rather than concurrently. The State argued, and the Court of Appeals agreed, that it lacked jurisdiction to entertain a criminal defendant's direct appeal of a presumptive sentence. See K.S.A. 21-4721(c)(1); *State v. Flores*, 268 Kan. 657, 659-60, 999 P.2d 919 (2000) (imposition of consecutive sentences does not alter presumptive character of sentences imposed). On petition for review, Dull argues only the merits of the issue and simply suggests the Court of Appeals "wrongly decided this issue." However, this court has a duty to consider jurisdictional issues *sua sponte*. *Williams*, 298 Kan. at 1080.

Dull's sentence in 09CR3878 was presumptive, *i.e.*, 24 months' imprisonment for the burglary offense concurrent to 12 months in county jail for the misdemeanor theft offense. However, his sentence in 10CR2224 for aggravated indecent liberties with a child was not presumptive. The district court granted a downward departure and imposed 45 months' imprisonment (low range was 89 months' imprisonment) and ordered it to run consecutive to 09CR3878, for a controlling term of 69 months' imprisonment.

K.S.A. 21-4721 governed Dull's appeal filed on June 21, 2011. The statute provided in relevant part:

"(a) A departure sentence is subject to appeal by the defendant or the state. The appeal shall be to the appellate courts in accordance with rules adopted by the supreme court.

. . . .

"(c) On appeal from a judgment or conviction entered for a felony committed on or after July 1, 1993, the appellate court shall not review:

(1) Any sentence that is within the presumptive sentence for the crime."

"Generally, consecutive sentences imposed under the Kansas Sentencing Guidelines are presumptive sentences which are not subject to review by this court." *State v. Frecks*, 294 Kan. 738, 739, 280 P.3d 217 (2012). However, in *State v. Ross*, 295 Kan. 1126, Syl. ¶ 12, 289 P.3d 76 (2012), we held:

"A life sentence for an off-grid crime is not a 'presumptive sentence' as contemplated in K.S.A. 21-4703(q) because imposition of the life sentence was not arrived at by applying the applicable grid block of the sentencing guidelines. Accordingly, when a defendant is convicted of both an off-grid crime and an on-grid crime and the district court orders the presumptive sentence for the on-grid crime to run consecutive to the life sentence for the off-grid crime, the resulting controlling sentence is not entirely a 'presumptive sentence' as defined in K.S.A. 21-4703(q). Thus, K.S.A. 21-4721(c) does not prevent a defendant from challenging a district court's decision to impose consecutive sentences in a multiple conviction case involving both off-grid and on-grid crimes. As such, we disapprove of the contrary holdings found in *State v. Flores*, 268 Kan. 657, 99 P.2d 919 (2000), and *State v. Ware*, 262 Kan. 180, 938 P.2d 197 (1997)."

Recently in *Looney*, the defendant was granted a downward durational departure but his motion for dispositional departure was denied. The Court of Appeals summarily denied his appeal for lack of jurisdiction citing K.S.A. 21-4721(c) and *State v. Huerta*, 291 Kan. 831, 247 P.3d 1043 (2011). We reversed on appeal, reasoning in part that the appellate court has jurisdiction over all departure sentences under K.S.A. 21-4721(a)

39

unless jurisdiction is divested by a more specific provision. Additionally, as Looney did not receive a presumptive sentence, subsection (c)(1) did not bar the Court of Appeals' jurisdiction to hear his appeal. 299 Kan. at 909.

Although neither of these cases address the precise scenario here, *i.e.*, consecutive presumptive and departure sentences, their analysis is instructive. While the imposition of consecutive sentences is not considered a departure, *Ross* indicates that because part of Dull's sentence was a departure sentence, the resulting controlling sentence is not entirely a presumptive sentence. See *Ross*, 295 Kan. 1126, Syl. ¶ 12. *Looney* provides that an appellate court has jurisdiction to hear Dull's appeal of his departure sentence under K.S.A. 21-4721(a) unless some other provision is controlling. See *Looney*, 299 Kan. at 908. Applying the reasoning of *Ross*, K.S.A. 21-4721(c)(1) does not prevent a defendant from challenging the district court's decision to impose consecutive sentences in a multiple conviction case involving a presumptive and departure sentence. 295 Kan. 1126, Syl. ¶ 12. Accordingly, the panel's dismissal for lack of jurisdiction under K.S.A. 21-4721(c)(1) was erroneous. In the interest of judicial economy, we will address the merits of Dull's argument.

*Standard of Review*

"A district court simultaneously sentencing multiple convictions generally has discretion to order the sentences to be served consecutively. See K.S.A. 21-4608(a); K.S.A. 21-4720(b)." *State v. Morningstar*, 299 Kan. 1236, Syl. ¶ 4, 329 P.3d 1093 (2014).

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does

not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Ross*, 295 Kan. 1126, Syl. ¶ 14.

*Analysis*

Dull argues the district court abused its discretion in denying his request and ordering the sentences in both cases to run consecutive to each other. At the plea hearing, the district court went over the plea agreement where the State agreed to recommend the low number in the appropriate sentencing guidelines grid box for each felony count and for all counts to run concurrently. In support of a separate motion to depart, Dull argued that he would benefit more from counseling than a long prison term, that he was very immature at the time of the offense, that he was a slow learner in special education classes at school, and that he believed he was dating the victim.

At sentencing, the district court said it had seriously considered the departure motion and observed the very generous nature of the plea agreement. It granted the motion to depart in 10CR2224 from a low range sentence of 89 months to 45 months and ordered it to run consecutive to the presumptive 24 months' imprisonment in the other case. The court reasoned that Dull's mental impairment caused him to lack substantial judgment when the crime was committed and the lack of participation by the victim in the proceedings resulted in less harm to the victim than typical for such an offense.

Dull argues several factors warranted the district court to order concurrent sentences: (1) the State recommended concurrent sentences; (2) he took responsibility for his actions and entered guilty pleas; and (3) the district court was aware that he had minimal criminal history. Dull's argument is without merit.

Although the district court is not obliged to follow a plea agreement, we note the State recommended the *low range sentence* of each felony offense be run concurrent with

41

each other. If the district court did not depart in 10CR2224, Dull would be facing a minimum controlling sentence of 89 months' imprisonment even if the cases were run concurrently. Accordingly, the district court clearly took into account all of the factors suggested by Dull in crafting a controlling sentence of 69 months' imprisonment, which is substantially less than the plea bargain he accepted. Accordingly, it cannot be said that no reasonable person would have imposed consecutive sentences in this case.

Judgment of the Court of Appeals is reversed. Judgment of the district court imposing consecutive sentences is affirmed. Judgment of the district court imposing mandatory lifetime postrelease supervision is vacated and remanded for resentencing.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 106,437 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.