APPEL, Justice (concurring in part and dissenting in part).
The majority reasons automatic, mandatory registration for juvenile sex offenders is in fact punishment but holds that such registration does not amount to cruel and unusual punishment under article I, section 17 of the Iowa Constitution. I agree the registration is punishment, however, I respectfully dissent from the majority's holding that the registration is not cruel and unusual.
I. Preliminary Concepts Regarding the Cruel and Unusual Punishment Clause.
A. Relevant Constitutional and Statutory Provisions.
1. Constitutional provisions . The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Similarly, article I, section 17 of the Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17.
*598 T.H. does not suggest an analytical framework under the Iowa Constitution different from that under the United States Constitution. See In re Det. of Matlock , 860 N.W.2d 898, 903 (Iowa 2015). Even so, we can independently apply the established federal framework, even if the United States Constitution and the Iowa Constitution contain similar or identical language. See Racing Ass'n of Cent. Iowa v. Fitzgerald , 675 N.W.2d 1, 6 (Iowa 2004).
2. Statutory provisions . This case involves a number of statutory provisions that are relevant to T.H.'s constitutional challenge to automatic, mandatory sex offender registration. I delineate three statutory provisions to provide context but bring attention to other relevant statutory provisions throughout this concurrence in part and dissent in part.
The juvenile court adjudicated T.H. delinquent for performing a sex act by force in violation of Iowa Code section 709.4(1)(a ). See Iowa Code § 709.4(1)(a ) (2016) ("A person commits sexual abuse in the third degree when the person performs a sex act ... by force or against the will of the other person ....").
Section 692A.102(1)(c )(10) classifies a conviction for "[s]exual abuse in the third degree in violation of section 709.4, subsection 1, paragraph "a", ... if committed by a person fourteen years of age or older[,]" as a tier III offense. Id. § 692A.102(1)(c )(10).
Section 692A.103(4) requires the court to order the juvenile "to register [as a sex offender] if the adjudication was for an offense committed by force" and the juvenile was at least fourteen years old at the time he or she committed the offense. Id. § 692A.103(4). In other words, the court has no discretion whatsoever in ordering a juvenile to register as a sex offender if it finds the applicable criteria. In this case, the court found it had no discretion to waive the requirement of registration because T.H. was fourteen at the time of the offense and T.H. had committed the offense with force.
B. Caselaw from Other Jurisdictions. The Ohio Supreme Court considered whether automatic, lifetime sex offender registration and notification requirements were cruel and unusual as applied to juveniles under the United States and Ohio Constitutions.[2] In re C.P. , 131 Ohio St.3d 513, 967 N.E.2d 729, 737-46 (2012). The court first undertook an examination under the Eighth Amendment of the United States Constitution by applying the two-step analysis from Graham v. Florida , 560 U.S. 48, 61, 130 S.Ct. 2011, 2022, 176 L.Ed.2d 825 (2010). Id. at 737-44. As to the first step, the court considered whether a national consensus against automatic, lifetime sex offender registration and notification requirements existed. Id. at 738-39. The court observed that the Federal Sex Offender Registration and Notification Act (SORNA) required states to conform to its provisions or risk loss of federal funds. Id. at 738. Many states, however, hesitated in complying with SORNA because it included juveniles on the registries. Id. at 738.
As to the second step, the court exercised its independent judgment to determine whether automatic, lifetime sex offender registration and notification requirements violated the Eighth Amendment. Id. at 740-44. The court considered the culpability of juveniles, the nature of the offense omitted, the severity of the punishment, and penological *599 justifications. Id. First, it observed juveniles are less morally culpable and more capable of change than adult offenders. Id. at 740-41. The reprehensible acts of juveniles "are less likely to reveal an unredeemable corruptness." Id. at 740. Second, the court stated the punishment embodied in the applicable Ohio statute "appl[ied] to juveniles with a reduced degree of moral culpability" because "a juvenile who did not kill or intend to kill has 'twice diminished moral culpability' on account of his age and the nature of his crime." Id. at 741 (quoting Graham , 560 U.S. at 69, 130 S.Ct. at 2027 ).
Third, the court stated automatic, lifetime sex offender registration and notification requirements, with the possibility of the court lifting them after twenty-five years, were "especially harsh punishments for a juvenile." Id. The court reasoned the punishment "is imposed at an age at which the character of the offender is not yet fixed ." Id. (emphasis added). Commenting on the stigma of the sex offender label, the court further reasoned, "Before a juvenile can even begin his adult life, ... the world will know of his offense. ... His potential will be squelched before it has a chance to show itself." Id.
Lastly, the court considered whether the theories of punishment justified imposing automatic, lifetime sex offender registration and notification requirements. Id. at 742-44. The court commented, "Notification and registration anchor the juvenile offender to his crime" instead of rehabilitating him. Id. at 742. The court reasoned the theory of retribution did not justify imposing such a serious punishment when juveniles were less culpable. Id. at 742-43. Additionally, the court discounted the theory of deterrence because juveniles were less likely to weigh future risks and consequences when making decisions. Id. at 743. As for the theory of rehabilitation, the court concluded automatic, lifetime sex offender registration and notification requirements thwarted the rehabilitative goals of the juvenile court system. Id. at 744. Specifically, publication of a juvenile's offense not only made reintegration into society more difficult but also inspired ostracism, vigilantism, and public shaming. Id. at 743-44. In sum, the court held the automatic imposition of lifetime sex offender registration and notification requirements violated the Eighth Amendment. Id. at 744.
Moreover, the court found the requirements unconstitutional under the prohibition against cruel and unusual punishment of the Ohio Constitution. Id. at 746. The court reasoned the requirements "frustrate[d] two of the fundamental elements of juvenile rehabilitation: confidentiality and the avoidance of stigma." Id. It stated, "Confidentiality has always been at the heart of the juvenile justice system[,]" yet "the very public nature of the penalty" evidenced the lack of proportionality. Id. at 745. The court further reasoned juvenile judges possessed "absolutely no discretion" in imposing the requirements when "the decided emphasis [of juvenile courts] should be upon individual, corrective treatment." Id. (second quoting In re Agler , 19 Ohio St.2d 70, 249 N.E.2d 808, 810 (1969) ). The court therefore held the punishment lacked proportionality to the crime such that it "shock[ed] the sense of justice of the community." See id. at 746 (quoting State v. Chaffin , 30 Ohio St.2d 13, 282 N.E.2d 46, 49 (1972) ).
The Pennsylvania Supreme Court held that lifetime registration under SORNA as applied to juveniles was unconstitutional. In re J.B. , 630 Pa. 408, 107 A.3d 1, 20 (2014). The reasoning of J.B. is instructive, although the court found a violation of due process rights and did not address whether *600 lifetime registration violated the prohibition against cruel and unusual punishment. See id. at 14-20. The court reasoned "the irrebuttable presumption that all juvenile offenders 'pose a high risk of committing additional sexual offenses' ... is not universally true and a reasonable alternative means currently exist for determining which juvenile offenders are likely to reoffend." Id. at 14 (quoting 42 Pa. Cons. Stat. § 9799.11(a)(4) ). Notably, the court reasoned juvenile sex offenders did not have a meaningful opportunity to challenge the presumption because the delinquency hearing did not consider whether the individual offender was at risk of reoffending. Id. at 17. Rather, the delinquency adjudication automatically designated the juvenile as a sex offender with the accompanying faulty presumption. Id. The court also rejected the suggestion that a hearing twenty-five years in the future provided an opportunity to be heard on the presumption. Id.
Rejecting the presumption, the court stated research shows "the vast majority of juvenile offenders are unlikely to recidivate." Id. at 18. It also noted juveniles and adults are fundamentally different because of the malleability of juveniles to rehabilitation. Id. In light of the fact that "the concepts of balanced and restorative justice" guide the juvenile justice system, the court reasoned "automatic registration remove[d] the juvenile judges' ability to consider the rehabilitative prospects of individual juvenile sexual offenders." Id. Lastly, the court reasoned individualized risk assessment provided a reasonable alternative means of evaluating which offenders posed a high risk of recidivism. Id. at 19.
In a case addressing whether mandatory lifetime postrelease supervision of juvenile sex offenders was cruel and unusual, the Kansas Supreme Court held that such supervision violated the Eighth Amendment. State v. Dull , 302 Kan. 32, 351 P.3d 641, 660 (2015). The reasoning in Dull is persuasive as to the issue of whether automatic, mandatory sex offender registration amounts to cruel and unusual punishment.
In Dull , the court found the defendant failed to show a national consensus against mandatory lifetime postrelease supervision for juvenile sex offenders. Id. The court, however, used independent judgment to conclude that such supervision was cruel and unusual for two reasons. Id. First, the diminished moral culpability of juveniles because of certain characteristics attributable to youth-"recklessness, immaturity, irresponsibility, impetuousness, and ill-considered decision making, along with their lower risks of recidivism"-tapered penological justifications. Id. Second, mandatory lifetime postrelease supervision was a "severe" sanction that "severely restricted" the juvenile's liberty. Id.
On the contrary, the Nebraska Supreme Court held lifetime community supervision was not cruel and unusual under the Eighth Amendment. State v. Boche , 294 Neb. 912, 885 N.W.2d 523, 538-39 (2016). The court applied its reasoning to resolve the issue of whether lifetime community supervision was cruel and unusual under the Eighth Amendment to address the parallel issue of whether lifetime registration violated the same, even if such registration could be described as punishment as to the defendant. See id. at 532-38. As to the first issue, the court reasoned Nebraska's statutory scheme allowed for a level of supervision narrowly tailored to each offender and subject to yearly review, with a requirement that the conditions imposed be the least restrictive available based on the risk of recidivism and public safety. Id. at 537. Moreover, the offender could appeal the restrictions. Id. at 533. The court found Nebraska's statutory *601 scheme was "individualized, adaptive, and incentivizes rehabilitation." Id. at 538.
As to the second issue, the court held lifetime registration was not punishment. Id. at 531-32. The court declined to revisit State v. Worm , 268 Neb. 74, 680 N.W.2d 151 (2004), on this issue. Id. Moreover, the court discounted the defendant's brief citing studies examining the recidivism rates of juvenile sex offenders because the defendant did not present the studies to the district court, such that neither that court nor the supreme court had evidence before it concerning his argument. Id. at 531.
Other jurisdictions have also found that sex offender registration is not cruel and unusual. See United States v. Juvenile Male , 670 F.3d 999, 1010 (9th Cir. 2012) (holding the potential shame and humiliation resulting from the twenty-five-year registration did not satisfy the high standard necessary to violate the Eighth Amendment); In re J.C., 13 Cal.App.5th 1201, 221 Cal.Rptr.3d 579, 591 (2017) (holding juvenile sex offender registration was not punishment because the offender "failed to show the limited degree of public disclosure applicable to juveniles required to register pursuant to [the applicable statute] is sufficiently burdensome to distinguish it from that applicable to adult offenders"); In re J.O. , 383 P.3d 69, 75 (Colo. App. 2015) (holding juvenile sex offender registration was not punishment in the first instance and thus declining to address whether such registration was cruel and unusual under the Eighth Amendment); In re J.W. , 204 Ill.2d 50, 272 Ill.Dec. 561, 787 N.E.2d 747, 762 (2003) (holding lifetime juvenile sex-offender registration did not constitute cruel and unusual punishment because of the limited dissemination of the offender's information). But see People v. Dipiazza , 286 Mich.App. 137, 778 N.W.2d 264, 273-74 (2009) (holding ten-year sex offender registration requirement was cruel and unusual as applied to an eighteen-year-old defendant in a consensual sexual relationship with a teen who was almost fifteen years old).
II. Analysis of the Cruel and Unusual Punishment Clause as Applied to This Case.
The underlying principle of the Cruel and Unusual Punishment Clause is the "bedrock rule of law that punishment should fit the crime." State v. Bruegger , 773 N.W.2d 862, 872 (Iowa 2009). Based on this principle, I would find automatic, mandatory sex offender registration as applied to juveniles violates the cruel and unusual punishment clause of the Iowa Constitution because of the lack of proportionality between the punishment and the offense committed.[3]
A. Low Recidivism and Sexual Reoffense Rates of Juvenile Sex Offenders Coupled with Their Responsiveness to Rehabilitative Treatment. The risk of juvenile sex offenders generally recidivating and sexually reoffending are low. Empirical studies have been dispelling the fear-based myth that juvenile sex offenders have a propensity to commit sex offenses as adults. See Human Rights Watch, Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the U.S. 30-31 (2013), https://www.hrw.org/sites/default/files/reports/us0513_ForUpload_1.pdf [hereinafter Raised on the Registry ]; Ashley R. Brost & Annick-Marie S. Jordan, *602 Punishment That Does Not Fit the Crime: The Unconstitutional Practice of Placing Youth on Sex Offender Registries , 62 S.D. L. Rev. 806, 809 (2017) [hereinafter Brost & Jordan]; Amanda M. Fanniff et al., Juveniles Adjudicated for Sexual Offenses: Fallacies, Facts, and Faulty Policy , 88 Temp. L. Rev. 789, 793-95 (2016).
In State v. Graham , we acknowledged "most juvenile offenders who commit sex offenses will outgrow their behavior and ... juveniles adjudicated delinquent for sex offenses have extremely low rates of recidivism generally and even lower rates of sexual reoffending." 897 N.W.2d 476, 484 (Iowa 2017). We charted comprehensive studies finding that juveniles posed little risk of recidivism. Id. at 484-85 (citing Michael F. Caldwell et al., An Examination of the Sex-Offender Registration and Notification Act as Applied to Juveniles: Evaluating the Ability to Predict Sexual Recidivism , 14 Psychol. Pub. Pol'y & L. 89, 96-97, 101 (2008) ; Elizabeth J. Letourneau & Kevin S. Armstrong, Recidivism Rates for Registered and Nonregistered Juvenile Sex Offenders , 20 Sexual Abuse: J. Res. & Treatment 393, 400 (2008); Franklin E. Zimring et al., Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort , 26 Just. Q. 58 (2009); Franklin E. Zimring et al., Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood? , 6 Criminology & Pub. Pol'y 507 (2007)); see also Amy E. Halbrook, Juvenile Pariahs , 65 Hastings L.J. 1, 13-15 (2013) [hereinafter Halbrook] (explaining in depth the Caldwell, Letourneau, and Zimring studies that found low risks of recidivism and sexual reoffending among juvenile sex offenders).
The Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking of the United States Department of Justice recently published a research brief reviewing the state of research on juvenile sexual reoffending and assessing the current practice in juvenile sex offender management. Christopher Lobanov-Rostovsky, U.S. Dep't of Justice, Recidivism of Juveniles Who Commit Sexual Offenses (July 2015), https://smart.gov/pdfs/JuvenileRecidivism.pdf. The brief reached some key conclusions from the collected empirical evidence. Id. at 5.
First, the observed sexual recidivism rates of juveniles who commit sexual offenses range from about 7 to 13 percent after 59 months, depending on the study. Recidivism rates for juveniles who commit sexual offenses are generally lower than those observed for adult sex offenders .... [R]ecidivism data suggest that there may be fundamental differences between juveniles who commit sexual offenses and adult sexual offenders, particularly in their propensity to sexually reoffend .
Second, a relatively small percentage of juveniles who commit a sexual offense will sexually reoffend as adults. The message for policymakers is that juveniles who commit sexual offenses are not the same as adult sexual offenders, and that all juveniles who commit a sexual offense do not go on to sexually offend later in life ....
Finally, juveniles who commit sexual offenses have higher rates of general recidivism than sexual recidivism. This suggests that juveniles who commit sexual offenses may have more in common with other juveniles who commit delinquent acts than with adult sexual offenders ....
Id. (emphases added).
Additionally, juveniles are more responsive to treatment and rehabilitation than adult sex offenders. Carole J. Petersen & Susan M. Chandler, *603 Sex Offender Registration and the Convention on the Rights of the Child: Legal and Policy Implications of Registering Juvenile Sex Offenders , 3 Wm. & Mary Pol'y Rev. 1, 31 (2011). Juvenile sex offenders who receive treatment for their sexual offenses exhibit lower recidivism rates than both treated adult sex offenders and untreated juvenile sex offenders. Phoebe Geer, Justice Served? The High Cost of Juvenile Sex Offender Registration , 27 Dev. Mental Health L. 34, 42 (2008) [hereinafter Geer].
Juvenile sex offenses do not necessarily signify permanent sexual deviance but appear to be exploratory in nature and a product of misplaced sexual curiosity. Id. ; see Catherine L. Carpenter, Throwaway Children: The Tragic Consequences of a False Narrative , 45 Sw. L. Rev. 461, 492 (2016) [hereinafter Carpenter] ("[P]oor social competency skills and deficits in self-esteem can best explain sexual deviance in children, rather than paraphilic interests and psychopathic characteristics that are more common in adult offenders." (quoting Ass'n for the Treatment of Sexual Abusers, Adolescents Who Have Engaged in Sexually Abusive Behavior: Effective Policies and Practices , (Oct. 30, 2012), www.atsa.com/pdfs/Policy/AdolescentsEngagedSexuallyAbusiveBehavior.pdf [https://perma.cc/5VKV-6SPD] )).
The United States Supreme Court has recognized the malleability of juveniles and their capacity for change in the landmark Roper - Graham - Miller trio. E.g. , Miller v. Alabama , 567 U.S. 460, 471-73, 132 S.Ct. 2455, 2464-65, 183 L.Ed.2d 407 (2012) ; Graham , 560 U.S. at 68, 130 S.Ct. at 2026 ; Roper v. Simmons , 543 U.S. 551, 569-70, 125 S.Ct. 1183, 1195, 161 L.Ed.2d 1 (2005). "[C]hildren are constitutionally different from adults ...." Miller , 567 U.S. at 471, 132 S.Ct. at 2464. Thus, juveniles "are less deserving of the most severe punishments" because of their "diminished culpability and greater prospects for reform." Id. (first quoting Graham , 560 U.S. at 68, 130 S.Ct. at 2026 ). The Supreme Court relied on three points of difference between juveniles and adults. Id. First, juveniles "have a 'lack of maturity and an underdeveloped sense of responsibility.' " Id. (quoting Roper , 543 U.S. at 569, 125 S.Ct. at 1195 ). Second, they "are more vulnerable ... to negative influences and outside pressures." Id. (quoting Roper , 543 U.S. at 569, 125 S.Ct. at 1195 ). Lastly, their "character is not as 'well formed' as an adult's; his [or her] traits are 'less fixed' and his [or her] actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " Id. (alterations in original) (quoting Roper , 543 U.S. at 570, 125 S.Ct. at 1195 ). Furthermore, "[w]e have emphasized that the constitutionally significant distinction between adults and children is applicable to all crimes, not just some crimes." State v. Crooks , 911 N.W.2d 153, 178 (Iowa 2018) (Appel, J., concurring in part and dissenting in part).
Accordingly, because of a low risk of recidivism in tandem with responsiveness to rehabilitative treatment, the current policies and practices designed to prevent adult sexual reoffending lack proportionality between the crime and the punishment as applied to juveniles.
B. Particularly Harsh Consequences on Youth. Although the risk of reoffending is low, the consequences that juveniles encounter are especially severe. They encounter "incredible barriers to housing, employment, and education." Brost & Jordan, 62 S.D. L. Rev. at 820 ; accord Stand Up for What's Right and Just (SURJ), Nat'l Juvenile Justice Network, The Case for Modifying Juvenile Sex Offender Registry Requirements in Delaware 3 (July 2011), http://www.njjn.org/uploads/digital-library/DE_Juvenile-Sex-Offender-Research-Brief_SURJ_7-30-11.pdf [https://perma.cc/6HQA-WV24]. The label of sexual offender branded like an indelible scarlet letter makes it difficult for juveniles on *604 the registry to integrate into society and become a productive, contributing member of society. See People ex rel. J.L. , 800 N.W.2d 720, 725 (S.D. 2011) (Meierhenry, J., concurring specially); Carpenter, 45 Sw. L. Rev. at 472 ("Without secure prospects for employment, education, or a stable living situation, children labeled as sex offenders are destined to spiral downward." (Footnotes omitted.)).
The adverse psychological damage to a child's identity formation and social development cannot be understated. See Raised on the Registry 50-55. Juveniles face stigmatization, shame, and isolation from family and friends. Id. at 50-51; see generally Stacey Hiller, The Problem with Juvenile Sex Offender Registration: The Detrimental Effects of Public Disclosure , 7 B.U. Pub. Int. L.J. 271, 292 (1998). At least twenty percent of juveniles on the registry will attempt suicide because of social stigma and psychological harm. Brost & Jordan, 62 S.D. L. Rev. at 823.
Among 281 juvenile sex offenders and family members of fifteen additional juvenile sex offenders interviewed by the Human Rights Watch, 250 of them (84.5 percent) described feeling depressed and isolated. Raised on the Registry 51. They also had difficulty in developing relationships and had thoughts of suicide. Id. In fact, fifty-eight individuals (19.6 percent) attempted suicide. Id.
Phoebe Geer described the damaging impact of registration and notification requirements as well as the stigmatization of the sex offender label:
Operating directly contrary to the rehabilitative goals of the juvenile justice system, sex offender registration and notification laws can publicly and permanently mark juvenile sex offenders as deviant criminals who should be feared and shunned . While many juvenile proceedings are confidential and sealed, sex offender registration and notification laws, by creating a public record, place the sexual offense of a juvenile directly and prominently in the public eye .
... [F]ew labels are as damaging in today's society as "convicted sex offender." Sex offenders are, as one scholar put it, "the lepers of the criminal justice system," with juveniles listed in the sex offender registry sharing this characterization. The state's interest in and responsibility for a juvenile's well-being and rehabilitation is not promoted by a practice that makes a juvenile's sex offenses public.
Geer, 27 Dev. Mental Health L. at 49 (emphases added) (quoting Robert E. Shepherd, Advocating for the Juvenile Sex Offender, Part 2 , 21 Crim. Just. 52, 53 (2007) ).
Juvenile sex offenders on the registry often encounter vigilante attacks. The Human Rights Watch reported that among 296 cases that it had examined, 154 (fifty-two percent) juvenile sex offenders experienced either violence or threats of violence against themselves or family members because of their registration. Raised on the Registry 56.
Consequences of the juvenile's registration status also attaches to the whole family. Halbrook, 65 Hastings L.J. at 18 ; Raised on the Registry 60-64. Family members of registrants encounter "isolation, threats, harassment, stress, and housing displacement." Halbrook, 65 Hastings L.J. at 18.
Additionally, pursuant to Iowa Code chapter 692A, juvenile sex offenders must adhere to rigid restrictions on movement. For example, T.H. must notify in person the county sheriff within five business days if he changes his residence, employment, or school. Iowa Code § 692A.104(1)-(2)
*605 (emphasis added). T.H. must appear in person to verify the location of his residence, employment, and school every three months. Id. § 692A.108(1)(c ).
The statute also imposes a number of exclusion zones. Except for the school he attends, T.H. may not be present upon, nor loiter within 300 feet of, the property of an elementary or secondary school. Id. § 692A.113(1)(a )-(b ). Additionally, T.H. may not be present upon (absent prior written permission by the library administrator), nor loiter within 300 feet of, the property of a public library. Id. § 692A.113(1)(f )-(g ). T.H. may not be present upon (unless he receives written permission from the child care facility), nor loiter within 300 feet of, the property of a child care facility. Id. § 692A.113(1)(d )-(e ). He may not be present upon, nor loiter within 300 feet of, "any place intended primarily for the use of minors." Id. § 692A.113(1)(h ). T.H. may not loiter on the premises of any facility for dependent adults and may not be present at an event that provides services or programming for dependent adults. Id. § 692A.115(1).
Furthermore, the statute imposes employment restrictions. See id. §§ 692A.113(3)(a )-(e ), .115. For example, while on the registry, T.H. may not work or volunteer at a "public or nonpublic elementary or secondary school, child care facility, or public library." Id. § 692A.113(3)(c ). He may not work or volunteer at "any place intended primarily for use by minors including but not limited to a playground, a children's play area, recreational or sport-related activity area, a swimming or wading pool, or a beach." Id. § 692A.113(3)(d ).
Lastly, the statute imposes residency restrictions. If the court requires T.H. to register after becoming an adult, he may not reside within 2000 feet of a school or child care facility. Id. § 692A.114(2).
The punishment is especially severe because confidentiality is nonexistent. The public may view T.H.'s personal information on the sex offender registry website. Id. § 692A.121(1). The registry contains T.H.'s full name; photographs; date of birth; home address; and physical description, including scars, marks, or tattoos. Id. § 692A.121(2)(b )(1)(a)-(e). Furthermore, the registry provides the statutory citation and text of his offense. Id. § 692A.121(2)(b )(1)(f). It also provides information on whether T.H. is subject to residency restrictions and exclusion zones. Id. § 692A.121(2)(b )(1)(g)-(h). The public can also request additional information concerning T.H. by contacting the county sheriff's office and simply providing T.H.'s name and T.H.'s date of birth. Id. § 692A.121(5)(a ). Additional information runs the gamut-a list of schools T.H. attended, employment information, locations and dates of any temporary lodging, and his vehicle information. Id. § 692A.121(5)(b ).
In sum, registration and notification requirements nullify the private nature of our juvenile court system. Moreover, the stigmatization of sexual offenders perpetuates the mistakes of youth into the permanence of adulthood. Accordingly, I would find the punishment is disproportionate to the crime, especially in light of the diminished moral culpability of juveniles. See Crooks , 911 N.W.2d at 179 ("[C]ulpability is a cornerstone of proportional punishment.").
C. No Meaningful Opportunity to Show Rehabilitation. The purported principal goal of the juvenile justice system is rehabilitation rather than punishment. McKeiver v. Pennsylvania , 403 U.S. 528, 544 n.5, 91 S.Ct. 1976, 1986 n.5, 29 L.Ed.2d 647 (1971). Yet juvenile sex offenders have no meaningful opportunity to show rehabilitation.
*606 Iowa Code section 692A.128 provides an escape valve in theory but not in practice. A court may not grant an application to modify the registration requirements unless the application meets all of the following criteria:
a . The date of the commencement of the requirement to register occurred at least two years prior to the filing of the application for a tier I offender and five years prior to the filing of the application for a tier II or III offender.
b . The sex offender has successfully completed all sex offender treatment programs that have been required.
c . A risk assessment has been completed and the sex offender was classified as a low risk to reoffend. The risk assessment used to assess an offender as a low risk to reoffend shall be a validated risk assessment approved by the department of corrections.
d . The sex offender is not incarcerated when the application is filed.
e . The director of the judicial district department of correctional services supervising the sex offender, or the director's designee, stipulates to the modification, and a certified copy of the stipulation is attached to the application.
Iowa Code § 692A.128(2)(a )-(e ).
Section 692A.128 does not provide a realistic chance for release. Although section 692A.128 provides a purported escape valve, this escape valve is inadequate because it requires the approval of the director of the judicial district department of correctional services. A unilateral decision by the director nullifies any meaningful opportunity to be heard on the issue of rehabilitation because the director's stipulation is likely unforthcoming. Section 692A.128(6) exempts the requirement of this stipulation if the offender is no longer under the supervision of the juvenile court or a judicial district department of correctional services. Id. § 692A.128(6). This exemption does not change the dynamics of the odds stacked up against the offender because it requires an additional hurdle: the agreement of the department of corrections to perform a risk assessment on the offender. See id. As with the stipulation, such an agreement is within the unilateral authority of the department of corrections.
Furthermore, section 692A.128 mandates the completion of all required sex offender treatment programs. Yet section 692A.103(4) requires juvenile judges to impose mandatory, automatic sex offender registration without any individualized risk assessment prior to the imposition of registration requirements. Section 692A.103(4) does not give discretion to juvenile judges to examine the individual's prior criminal record, evaluate his or her personality and social history, assess reports of any psychiatric examinations of him or her, and any other pertinent information in relation to whether to impose the requirements. Without such an individualized risk assessment, it is rather difficult to know which treatment program a juvenile sex offender should be required to undergo.
I now turn to Iowa Code chapter 232. Through its interpretation of this chapter, the majority reasons juveniles have an opportunity to be heard on the question of mandatory registration at the close of jurisdiction of the juvenile court. Specifically, section 232.54(1)(i ) provides,
With respect to a dispositional order requiring a child to register as a sex offender pursuant to chapter 692A, the juvenile court shall determine whether the child shall remain on the sex offender registry prior to termination of the dispositional order .
*607 Id. § 232.54(1)(i ) (emphasis added). This purported escape valve, however, provides for a hearing at the wrong juncture. The court should hold a hearing concerning rehabilitation after the juvenile has an opportunity to develop maturity and present corresponding evidence of rehabilitation and mitigating circumstances. Ordinarily, this should occur sometime after the child reaches the age of twenty-five when full maturity and character formation is ordinarily complete. A court may deny the opportunity to show rehabilitation and maturity at the early age of eighteen, prior to reaching full maturity, only upon a showing of incorrigibility and irredeemable corruption. The record shows no evidence that T.H. received a Miller -type hearing showing that he is incorrigible and irredeemably corrupt.
Our juvenile justice system should not forget the principle on which it was founded-juveniles are constitutionally different from adults. Moreover, "seek[ing] to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system ...." People v. Taylor , 221 Ill.2d 157, 302 Ill.Dec. 697, 850 N.E.2d 134, 141 (2006) ; accord In re S.K. , 587 N.W.2d 740, 742 (S.D. 1999) (stating the purpose of the juvenile court system is to rehabilitate, not punish). Juvenile sex offenders should have a meaningful opportunity to demonstrate rehabilitation and maturity after their characters are fully formed.
III. Conclusion.
Based on the foregoing reasons, I would vacate the decision of the court of appeals, vacate the judgment of the district court, and remand.
Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.

The court also considered whether automatic, lifetime sex offender registration and notification requirements violated the defendant's due process rights. In re C.P. , 131 Ohio St.3d 513, 967 N.E.2d 729, 746-50 (2012).

That I addressed the issue of whether automatic, mandatory sex offender registration is cruel and unusual under the Iowa Constitution does not preclude the finding of a violation under the United States Constitution.