NOT DESIGNATED FOR PUBLICATION

No. 126,436

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VINCENT FONTAINE MEEKS JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA S. LEWISON, judge. Submitted without oral argument. Opinion filed January 10, 2025. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., GARDNER, J., and CARL FOLSOM III, District Judge, assigned.

PER CURIAM: After teenagers hosted a going-away party at his residence, Vincent Fontaine Meeks Jr. was charged with various crimes and convicted by a jury of one count of aggravated indecent liberties with a child, one count of indecent solicitation of a child, and one count of furnishing alcohol to a minor. The district court imposed a standard 90-month prison sentence to be followed by lifetime postrelease supervision. On appeal, Meeks argues the district court erred in two ways: first by allowing the State to amend the charging document, and second, by sentencing him to lifetime postrelease

1

supervision. For the reasons to be discussed below, we find no error by the district court and affirm Meeks' convictions and sentences.

FACTUAL AND PROCEDURAL BACKGROUND

*Party at the Meeks' residence*

All minors' identities will be protected throughout this opinion by the use of pseudonyms. In August 2021, 15-year-old Mary and her friends were planning a party for two others who were leaving town. The party took place at another friend, Susan's, home. Susan lived there with her uncle, Meeks, who was then 31 years old, along with several other family members. Suffice it to say, the teens carefully planned the party to keep the objective—to smoke marijuana and drink alcohol—a secret from their parents and guardians as best they could.

The day of the party, the teens started drinking alcohol early in the day and continued to drink and smoke throughout the day. Mary and her friends gave Meeks money to buy alcohol, and Meeks also allowed them to use the alcohol he already had at the house. More friends started to arrive, and more drinking and smoking ensued. As the party grew to a close, Meeks yelled at everyone to leave the house unless they were sleeping over. Ultimately, a group of teens, including Mary, slept at Meeks' home, with Mary and one other girl in the living room and another group sleeping in a bedroom. Meeks approached the teens in the living room, making sexually suggestive comments, and the second teen was uncomfortable and left the room.

Mary stayed in the living room, and Meeks continued his sexual advances. Eventually, Meeks removed a tampon from Mary's vagina and discarded it in the trash. He asked Mary if she wanted to have sex with him. Mary responded, "[Y]es" because she felt there were no other options and did not want to find out what would happen if she

2

said no. Mary had sexual intercourse with Meeks. Meeks then told Mary to get up and go use the bathroom, so she went to get herself cleaned up. After cleaning herself, she returned to the living room and laid down. The other teen returned and asked Mary if she was okay, to which Mary answered she was fine.

The next morning, Mary texted her mother to pick her up. After arriving home and then sleeping all day, Mary realized she had several missed calls and text messages from friends, asking her about what happened the previous night and rumors of what happened between Mary and Meeks. Mary eventually told her friends during a group video chat what happened with Meeks. Mary's friends told her that she had 24 hours to tell her mother and report the incident or they would report it for her. Mary told her mother about what happened at the party and her stepfather called the police.

The next day, Mary underwent a sexual assault examination. Internal vaginal swabs taken during the exam tested positive for seminal fluid and the DNA analysis resulted in a positive match to Meeks.

*Law enforcement interview and arrest Meeks.*

About a month later, Meeks was arrested and was interviewed at the Riley County Police Department by Detective Brian Zachary. During the interrogation, Meeks admitted being present at the party and allowing the teenagers to drink alcohol and smoke marijuana. Meeks claimed he was drunk that night and blacked out. Meeks asked if he was being arrested for furnishing alcohol to minors and Detective Zachary said it was one of the causes on the warrant.

Meeks said some of the girls stayed overnight and that they slept in his room. He stated he slept in the living room with his son. Meeks told Detective Zachary that he did not remember much from that night because he was high and drunk. Meeks claimed he

sent all the girls into his room at night to give them privacy, but when he woke up there were two girls in the living room. Meeks did not remember talking to the girls when he woke up. Meeks maintained that nothing happened between him and the girls that stayed in the living room.

Detective Zachary explained the charges on the warrant and Meeks denied having sexual contact with anyone at the party. Meeks denied he raped anyone at the party and said if anything did happen, he did not remember anything because he was drunk. Meeks stated he never forced himself on anyone and argued he could not have raped anyone because he was intoxicated. Meeks maintained that he would not rape anyone and would take a lie detector test to prove it. Meeks argued that it could be possible that some of the girls could have taken advantage of him while he was drunk but did not concede to remembering anything. When Detective Zachary asked what he would say if his DNA was found in the tests, Meeks said that would mean someone, which he suspected was Mary, would have had sex with him while he was unable to give consent due to intoxication. Meeks also denied touching or groping any of the other girls at the party. He alleged that Mary and her friends were making stories up to get back at Susan, his niece, by getting him into trouble because they did not like Susan.

*The jury finds Meeks guilty.*

The State charged Meeks with one count of rape in violation of K.S.A. 2021 Supp. 21- 5503(a)(2), one count of aggravated indecent liberties with a child under K.S.A. 2021 Supp. 21-5506(b)(1), three counts of aggravated indecent liberties with a child under K.S.A. 2021 Supp. 21- 5506(b)(2)(A), one count of attempted aggravated indecent liberties with a child under K.S.A. 2021 Supp. 21-5506(b)(2)(A), three counts of indecent solicitation of a child under K.S.A. 2021 Supp. 21- 5508(a)(1), one count of criminal threat under K.S.A. 2021 Supp. 21-5415(a)(1), one count of unlawfully hosting minors consuming alcoholic liquor or cereal malt beverage under K.S.A. 2021 Supp. 21-5608,

and one count of furnishing alcoholic liquor to a minor under K.S.A. 2021 Supp. 21-5607(a).

During opening statements at trial, Meeks' counsel conceded that the DNA evidence was solid and showed that Meeks had sex with Mary. Again in closing argument, defense counsel reiterated the DNA evidence would implicate Meeks having sex with Mary, so the defense would not be contesting Count 2, aggravated indecent liberties with Mary, a child under 15 years-old, in violation of K.S.A. 21-5506(b)(1). But Meeks maintained his defense theory of voluntary intoxication for the other charges.

The jury found Meeks guilty of three charges—Count 2, aggravated indecent liberties with a child, Mary; Count 7, indecent solicitation of a child, Mary, and Count 12, furnishing alcohol to a minor—and acquitted him of the remaining charges. The district court sentenced Meeks to 6 months in county jail to run concurrent to a 90-month prison sentence, with lifetime postrelease supervision.

Meeks timely appeals.

### THE DISTRICT COURT DID NOT ERR BY ALLOWING THE STATE TO AMEND THE CHARGING DOCUMENT

Meeks first argues the district court improperly permitted the State to amend its charging document after the evidence was fully presented at trial. The State's initial Complaint/Information charged Meeks in Count 2 with "unlawfully, feloniously and *knowingly*" having sexual intercourse with Mary, "a child 14 or more years of age, but less than 16 years of age."

During trial, after the parties finished their presentations of evidence, the State moved to have the word "knowingly" removed from the charging document during the

5

jury instruction conference. Defense counsel objected to the State's request and argued the State was alleging a fundamentally different charge. The district court overruled the objection finding the deletion of the word "knowingly" did not create a different charge.

The district court provided a jury instruction mirroring the statutory language in K.S.A. 2021 Supp. 21-5506(b)(1), which reads: "Aggravated indecent liberties with a child is: (1) Sexual intercourse with a child who is 14 or more years of age but less than 16 years of age." Meeks was convicted under that same statute on Count 2, and now argues the district court erred by allowing the State to amend the charging document to remove the word "knowingly" from Count 2.

*Applicable Legal Standards*

In general, appellate courts apply an abuse of discretion standard to a district court's decision to grant a motion to amend an information. *State v. White*, 316 Kan. 208, 213, 514 P.3d 368 (2022). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

Under K.S.A. 2021 Supp. 22-3201(e), the State may amend a complaint or information "at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." When assessing prejudice, appellate courts consider whether "(1) the date was a critical issue; (2) the change implicates the statute of limitations; (3) the amendment affects an alibi defense; (4) time was an element of the offense; or (5) there is any surprise to the accused." *White*, 316 Kan. at 213-14 (citing *State v. Holman*, 295 Kan. 116, 146, 284 P.3d 251 [2012], *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 [2016]).

6

*The amendment of the charging document was not erroneous.*

Meeks contends that the State's late amendment—well into trial, at the instruction conference—prejudiced him by changing the rules of engagement after he had presented his case. He argues the amendment amounted to a substantial change in the charge that diluted the State's burden of proof. Meeks relies on our Supreme Court's decision in *State v. Wade*, 284 Kan. 527, 161 P.3d 704 (2007), to support his argument.

In *Wade*, the State charged the defendant with aggravated burglary as the predicate offense for felony murder. But the burglary charge did not specify the underlying felony Wade was alleged to have intended to commit upon entry to the home. Based on Wade's testimony, after the close of the evidence, the State moved to amend the charging document to add aggravated assault as an alternative predicate felony for both the felony murder and aggravated burglary charges. The district court did not amend the charging document but permitted the elements instruction on aggravated burglary to include both premeditated murder and aggravated assault as the underlying felony. 284 Kan. at 530.

On appeal, our Supreme Court later reversed Wade's conviction, finding the district court erred by permitting the State to amend the instructions, because the added ulterior felony transformed Wade's defense testimony into an after-the-fact-confession. 284 Kan. at 535-36. The court held it is improper to "change the rules of engagement, after the fact, to dilute the State's burden," and such trial by ambush tactic prejudiced Wade's due process rights by changing the theory of the crime identified in the charging document. 284 Kan. 537. The court also found "the instruction on the elements of aggravated burglary was erroneous in adding an ulterior felony for which [Wade] had no notice prior to the completion of the evidentiary portion of the trial." 284 Kan. at 537. The court focused on the due process concerns and prejudice to the defendant, and whether the defendant had sufficient notice of the theory on which the State was pursuing its case. See 284 Kan. at 542.

7

Meeks focuses his argument on *Wade*—which addressed an instructional error—but does not articulate how his rationale fits into an abuse of discretion framework. That is, he fails to explain how the district court's decision here equates to an error of law or fact, or how it is unreasonable. So, we examine each possibility in turn.

First, we see no error of fact and dismiss this potential for error outright. We next consider whether the district court made an error of law under K.S.A. 2021 Supp. 22-3201(e). Applying the factors outlined above, we conclude the date was not a concern in this amendment, the change did not implicate the statute of limitations, the amendment did not affect an alibi defense, and time was not an element of the offense. See *White*, 316 Kan. at 213. The only remaining factor to consider, then, is whether there was any surprise to Meeks resulting from the amendment. This also touches on the notice element that it seems Meeks is emphasizing through his focus on *Wade*.

The State argues Meeks was not prejudiced by the amendment because the amendment did not charge a different crime. Further, the State argues the amendment did not prejudice Meeks' substantial rights because the change did not affect his defense strategy. Because Meeks' defense strategy was not affected, the State reasons this case is less like *Wade* and more like this court's decision in *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 242 P.3d 1197 (2010).

The *Calderon-Aparicio* panel considered whether the district court erred by allowing the State to amend a charge of possession of marijuana with intent to sell to also include the intent to deliver or distribute. The panel determined that the amendment did not add a new or different crime, but rather provided an alternative way of committing a single offense. 44 Kan. App. 2d at 849. The court held that Calderon-Aparicio's substantial rights were not prejudiced because the evidence in the case to provide possession with intent to sell or to distribute or deliver was in fact the same. 44 Kan. App. 2d at 849. Holding that Calderon-Aparicio's defense at trial would not have been affected

8

by the amendment, the *Calderon-Aparicio* panel found the district court did not abuse its discretion by allowing the State to amend the complaint and affirmed the conviction. 44 Kan. App. 2d at 849-50.

Unfortunately, the cases cited by the parties hold little persuasive value as applied to this case. First, Meeks' reliance on *Wade* is misplaced because the *Wade* court never considered whether the removal of general intent from the charging document affected the due process right of the defendant. There, the issue was whether the State could amend the jury instructions to include another entirely new underlying felony based on the testimony from the defendant. 284 Kan. at 535-36. That is simply factually and legally distinct from the circumstances Meeks faced. The same can be said with the State's reliance on *Calderon-Aparicio*. There, this court decided whether an addition of other alternative methods of committing a single offense violated the defendant's due process right. 44 Kan. App. 2d at 847. But the *Calderon-Aparicio* court, again, did not consider whether removing general intent from a charge would affect the outcome of the trial.

Here the question is purely whether the removal of the word "knowingly" from the charging document was so prejudicial that it deprived Meeks of his substantial rights. Meeks argues that removal of the word "knowingly" from the charging document—and thus the jury instruction for Count 2—changed the rules of engagement and precluded his defense theory that he did not knowingly have sexual intercourse with Mary. But Meeks was never entitled to a charge or a jury instruction that required the State to prove a mental state of "knowingly" in Count 2. This mental state is not a requirement for aggravated indecent liberties under K.S.A. 21-5506(b)(1).

Under K.S.A. 22-3201(d), the district court is allowed to strike surplusage from the complaint or information. So even if this removal of surplusage affected Meeks' trial strategy—it was not a trial strategy that he was entitled to under K.S.A. 21-5506(b)(1).

Thus, we cannot hold that the removal of this language from the charging document was so prejudicial that it deprived Meeks of his substantial rights. See, e.g., *United States v. Henry*, 504 F.2d 1335, 1339 (10th Cir. 1974) ("The addition of an issue by careless drafting cannot give the defendant a windfall. The terms, 'knowingly' and 'unlawfully,' introduced an element which the statute does not require the prosecution to prove, and thus is clearly surplusage.").

Under these circumstances, we see no legal error, and a reasonable fact-finder could have concluded that removal of "knowingly" from the complaint did not charge Meeks with a new or different crime, nor did it prejudice his substantial rights. For these reasons, we find no abuse of discretion by the district court.

LIFETIME POSTRELEASE SUPERVISION

Meeks next argues his sentence is unconstitutional because lifetime postrelease supervision would be a cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution and section 9 of the Kansas Constitution Bill of Rights as applied to the specific facts of his case. Meeks claims the district court made insufficient findings based on the *Freeman* factors, as analyzed below, and made erroneous legal conclusions based on speculation and presuppositions. See *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978).

At the outset, we note that Meeks fails to expand upon his Eighth Amendment challenge under the United States Constitution and merely relies on state constitutional argument. A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). As a result, we consider his Eighth Amendment arguments waived. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021). We will analyze Meeks' constitutional challenge under the lens of section 9 of the Kansas Constitution Bill of Rights.

10

*Applicable Legal Standards*

Appellate courts apply a bifurcated standard of review when assessing whether a sentence is cruel or unusual in violation of section 9 of the Kansas Constitution Bill of Rights. See *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012) (citing *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 [2008]). This court reviews the district court's factual findings for substantial competent evidence without reweighing the evidence. The legal conclusions drawn from the factual findings are considered de novo. *Mossman*, 294 Kan. at 906 (citing *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 [2009]; *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 [2007]).

In addition, a challenge to lifetime postrelease supervision imposed under K.S.A. 2021 Supp. 22-3717(d)(1)(G) is an indirect attack on the statute's constitutionality as applied. "[I]f there is any reasonable way to construe the statute as constitutional, courts have the duty to do so by resolving all doubts in favor of constitutionality." *Mossman*, 294 Kan. at 906-07 (citing *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 [2009]).

Section 9 of the Kansas Constitution Bill of Rights prohibits the State from imposing a cruel and unusual punishment upon those convicted of a crime. The United State Supreme Court and the Kansas Supreme Court have both recognized that a punishment violates these constitutional safeguards when a sentence is grossly disproportionate to the crime. *Solem v. Helm*, 463 U.S. 277, 288-89, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); *Freeman*, 223 Kan. at 367.

To determine whether a sentence's length is unconstitutionally disproportionate to the crime for which that sentence is imposed, Kansas courts consider three factors, commonly known as the *Freeman* factors:

11

"'(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"'(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"'(3) A comparison of the penalty with punishments in other jurisdictions for the same offense.'" *Mossman*, 294 Kan. at 908 (quoting *Freeman*, 223 Kan. at 367).

No one *Freeman* factor is individually controlling, but the district court must address all three factors in its analysis. *State v. Riffe*, 308 Kan. 103, 109, 418 P.3d 1278 (2018).

Generally, an appellate court presumes the district court made the necessary findings to support its conclusion when a party did not object to insufficient findings. See *State v. Longoria*, 301 Kan. 489, 506, 343 P.3d 1128 (2015). But when the record on appeal does not support this presumption, the appellate court must remand for additional factual findings and legal conclusions. *Riffe*, 308 Kan. at 111.

*Lifetime postrelease supervision is not unconstitutional as applied to Meeks.*

K.S.A. 2021 Supp. 22-3717(d)(1)(G)(i) mandates that a person sentenced to imprisonment for a sexually violent crime be placed on a mandatory lifetime postrelease supervision. Meeks acknowledges our Supreme Court has found that this mandatory lifetime postrelease supervision is not categorically unconstitutional. *State v. Cameron*, 294 Kan. 884, 895-98, 281 P.3d 143 (2012). But Meeks argues this lifetime period is unconstitutional as applied to his case, not categorically.

12

Before sentencing, Meeks moved for the imposition of a 36-month postrelease supervision period, arguing that under the *Freeman* analysis, it would be unconstitutional to impose on him a lifetime postrelease period. At sentencing, the district court addressed Meeks' motion and announced its analysis of the *Freeman* factors. The district judge went through an extensive review of its findings:

"So the factor number 1 is the nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment. And penological purposes include retribution, deterrence, incapacitation and rehabilitation.

"*Freeman* factor number 2 is a comparison of the punishment with punishments imposed in this jurisdiction in Kansas for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty to that extent is suspect; and a comparison of the penalty with punishments in other jurisdictions for the same offense. And then the factor—*Freeman* factor 3 is a comparison—I'm sorry. I already said that. A comparison of the penalty with punishments in other jurisdictions for the same offense."

"So when we look at the *Freeman* factor number 1, the Court examines the nature of the offense and the character of the offender with particular regard to the degree of danger present to society. And I would incorporate the findings that I made in my analysis of the departure motion with my analysis under this prong. I won't go back through all of that. But as I stated earlier, Mr. Meeks, in the Court's opinion, does present a high degree of danger to the community. The fact that he pursued a young woman that he knew was underage, an underage peer of his niece, indicates to the Court that he may have a propensity to commit this type of crime.

"There has been evidence presented that he does have a substance use disorder and that he was intoxicated on the night in question, but if he's unable to maintain control of these behaviors when he's under the influence of alcohol and drugs, then in the Court's opinion he does need to have supervision for his lifetime to make sure that he abstains from the use of these substances and/or follows up with any recommended ongoing treatment.

13

"There was a lot of analysis about that there's no need for this post-release supervision when Mr. Meeks is an old man or an elderly man, but unfortunately the Court's experience is that attaining an advanced age is not a guarantee that a person will not commit sexual crimes against children; and again, unfortunately, I can think of plenty of examples where sexual crimes were committed against children by an elderly person.

"In the Court's opinion, Mr. Meeks's individual circumstances do not justify a finding of unconstitutionality of the lifetime post-release. I feel that that particular *Freeman* factor is strongly against him.

. . . .

"So the analysis for prongs 2 and 3 of Freeman are specific to the crime of conviction. Only prong 1 is specific to this individual person and the individual circumstances of the case. So while I acknowledge that factors 2 and 3 may cut in favor of the defendant, the—looking at the totality of the three factors I still find that Mr. Meeks's individual circumstances don't justify a finding of unconstitutionality of the lifetime post-release, so I will deny the motion and I will impose lifetime post-release supervision."

Meeks argues that the district court found that the second and third factors weighed in his favor, but the court's finding on the first factor was not based on substantial competent evidence.

1. *The first* Freeman *factor*

Before the district court, when addressing the first *Freeman* factor, which focuses on nature of the offense and character of the offender, Meeks argued his case was factually comparable to *State v. Proctor*, 47 Kan. App. 2d 889, 280 P.3d 839 (2012) (*Proctor I*), and *State v. Proctor*, No. 104,697, 2013 WL 6726286, at *4-8 (Kan. App. 2013) (unpublished opinion) (*Proctor II*). In *Proctor I*, Proctor pleaded guilty to multiple sex crimes with a minor and a panel of this court held that an imposition of a lifetime postrelease supervision was unconstitutional as applied to Proctor based on several reasons. 47 Kan. App. 2d at 937. The facts lacked a showing of physical harm to the 12-year-old victim, lack of criminal history, Proctor was 19 years old, he was willing to

14

participate in treatment for sex offenders, and finally, he was also a victim of sexual abuse and never received proper treatment for the trauma he experienced.

Our Supreme Court granted review of *Proctor 1* and remanded the case for reconsideration. *Proctor II*, 2013 WL 6726286, at *1. A different panel of this court again found that lifetime postrelease supervision was unconstitutional as applied to Proctor based on the analysis of his personal history and circumstances under the *Freeman* factors. 2013 WL 6726286, at *4-8.

Addressing the first *Freeman* factor, the *Proctor II* panel found:

"Proctor was barely an adult himself at the time of the offenses. He had no juvenile or adult criminal record and, thus, no demonstrated incorrigibility. And nothing indicated Proctor was a serial sex offender with a trail of victims. Proctor had been a victim of sexual abuse in his adolescence and went without any professional help in coping with that trauma. None of that, of course, in any way excuses Proctor's actions in victimizing T.C. Nor does it undo the trauma to T.C. But it does suggest a defendant who, as the district court found, would very likely benefit from mental health therapy and counseling and sex offender treatment more than from incarceration. Moreover, as the State agreed and the district court found, that disposition was compatible with the public safety." 2013 WL 6726286, at *4.

The holding in *Proctor II* highlights many factual components relevant to the first *Freeman* factor.

On the contrary, the facts of Meeks' situation are starkly different, despite his claims. Meeks is 31 years old, much older than Proctor at the time of trial, and there is a much larger discrepancy between Meeks' age and the age of his victim. Meeks, unlike Proctor, had a prior criminal record, albeit for misdemeanor criminal trespass and a nonperson felony of interference with law enforcement officers. Also, Proctor pleaded

15

guilty and was granted probation for his litany of mitigating factors, while Meeks went to trial and was sentenced to a standard prison sentence. These are significant differences from the mitigating factors found in *Proctor I* and *Proctor II* that compelled this court to hold a period of lifetime postrelease supervision was unconstitutional as applied to Proctor.

On that note, none of the mitigating factors present in *Proctor I* and *Proctor II*—such as the young age, no prior criminal history, and being a victim of sexual abuse himself—are present here. And the record belies Meeks' argument that the district court's findings were not supported by substantial evidence. As the State claims, the district court provided a substantial analysis of the facts and found the first *Freeman* factor to be strongly against Meeks. In its previous finding on the denial of the departure sentencing motion, based on the evidence of the case, the district court found:

- Meeks' behavior was disgusting and inappropriate. He demonstrated he had no boundaries when it came to the children at the party, who were in his care because there were only two adults in the residence at the time of the party.
- Meeks was approximately 30 years old at the time of the incident. He wasn't 19 or 21—he was of an age where he should have developed enough judgment to know the children at the party were his nieces' peers and were not of legal age to consent to sex.
- Meeks took the teens' money, provided alcohol to the minors, and even drank with them. He also joined in and smoked marijuana with the teenagers.
- Meeks was voluntarily intoxicated. And although he claims to have blacked out, he was aware enough to remove Mary's tampon, discard it in the trash can, and return to have sex with her. It showed that Meeks was aware and

16

coordinated, not something that a drunk person would be able to successfully execute.

- He was voluntarily intoxicated when he knew he was responsible for the well-being of the teenagers that were at his home engaging in risky activities. He even knew about his problem with alcohol, because he told Detective Zachary why he gave up hard liquor, and still engaged in those activities.

- The victim, Mary, suffered extreme emotional and psychological injury that she will have to carry.

Incorporating these findings, the district court found that Meeks presented a high degree of danger to the community. The court found Meeks showed the propensity to commit this type of crime in the future because he knowingly pursued an underaged girl because he knew she was a friend of his niece. The court also noted that there was evidence present about Meeks' substance use disorder and that his inability to maintain control of his behaviors when under the influence calls for the need to have supervision for his lifetime to make sure he abstains from substance abuse and undergoes treatment. The district court also found baseless Meeks' argument that postrelease supervision would be unnecessary when Meeks becomes an elderly man, stating that plenty of cases show sexual crimes were committed against children by elderly persons. Based on these reasons, the district court found the first *Freeman* factor to weigh strongly against him.

Meeks also claims on appeal the district court should have considered his voluntary intoxication as a mitigating factor when determining whether lifetime postrelease supervision was unconstitutional. He also faults the district court for not giving weight to the fact that he was blackout drunk and was only doing what the teenagers asked him to do. Most importantly, he argues the district court should have considered the fact that Mary explicitly consented to sexual intercourse twice. But none of these factors favor Meeks.

17

It is entirely irrational that Meeks' irresponsible behaviors of drinking and smoking marijuana with teenagers until he blacked out could be considered in any way favorable to him. These behaviors are examples of what not to do as adults in the presence of minors and, as explained by the district court, actually exemplify the danger Meeks presents to society. Moreover, these arguments that minor victims consented or initiated sexual contact have been found unpersuasive by our Supreme Court because victims of those crimes are legally incapable of consenting to such acts. *State v. Funk*, 301 Kan. 925, 940, 349 P.3d 1230 (2015); see also *Mossman,* 294 Kan. at 910 (defendant alleged sex acts with 15-year-old victim were consensual). Meeks cannot rely on the consent of Mary as it does not weigh in his favor.

The factual circumstances of this case are more like those found in *Funk*. There, Funk and his college friend drank alcohol and huffed aerosol cans and urged a 14-year-old girl to do the same. Ultimately, the 14-year-old girl performed oral sex on Funk and again engaged in sexual conduct at a party later that night. Our Supreme Court held that lifetime postrelease supervision was not unconstitutional because Funk presented no evidence regarding his background or risk of recidivism that would undermine the deterrent justification of lifetime postrelease supervision as applied to sexual offenders in other cases, such as *Mossman* and *Proctor II*. *Funk*, 301 Kan. at 938-39.

Adhering to the logic employed in *Funk*, and viewing the record as a whole, the lifetime postrelease supervision imposed on Meeks was not unconstitutional. Our Supreme Court has recognized time after time that the penological purpose of lifetime postrelease supervision for sex offenders is more critical because it includes rehabilitation and incapacitation, and not just punishment. *Mossman*, 294 Kan. at 902. As our Supreme Court addressed in *State v. Dull*, 302 Kan. 32, 57, 351 P.3d 641 (2015), this is especially appropriate because of the high recidivism rate particularly in sex offenders.

18

"'Rehabilitation and incapacitation are central purposes of the criminal justice system, and they are particularly critical here given the propensity of sex offenders to strike again. Supervised release can further the end of rehabilitating sex offenders. For instance, in this case, the express conditions of supervised release will require [the defendant] to receive sex offender treatment and to avoid situations where he may be tempted to offend again. Relatedly, supervised release helps incapacitate sex offenders by keeping them under the watchful eye of probation officers who may be able to detect problems before they result in irreparable harm to innocent children.' [Citations omitted.]" 302 Kan. at 57.

Further, our Supreme Court has held that the design for postrelease supervision is mainly "'to act as a deterrent to future crime, a goal that is particularly legitimate given sex offenders' higher rate of recidivism.'" *Funk*, 301 Kan. at 939.

As our Supreme Court in *Dull* expounded, it is understandable that the requirements a person must meet under postrelease supervision could be arduous and that it can significantly alter one's life. 302 Kan. at 53-56. It is also understandable that lifetime postrelease supervision restricts Meeks' "liberty for life without any chance, hope, or legal mechanism of having those restrictions lifted or even reduced." 302 Kan. at 55. But our Supreme Court has consistently declined to consider the potential consequence of going back to prison if a defendant commits a new crime. *Funk*, 301 Kan. at 938.

For the preceding reasons, and the lack of any mitigating evidence from Meeks, the factual findings of the district court were supported by substantial competent evidence. As a result, we affirm the district court's finding that the first *Freeman* factor does not favor Meeks. But no one *Freeman* factor is individually controlling, so we continue to consider the other two factors in our analysis. *Riffe*, 308 Kan. at 109.

19

2. *The second* Freeman *factor*

The second *Freeman* factor requires us to review the punishment meted out to Meeks compared to other punishments in this jurisdiction for more serious offenses. *Mossman*, 294 Kan. at 908. If more serious crimes are found to impose less severe punishment than the offense in question, the challenged penalty is questionable. 294 Kan. at 908.

Meeks claims the district court found this factor to weigh in his favor. In pertinent part, the district judge announced during the sentencing:

"*Freeman* factor number 2. [Defense counsel] has kind of provided an analysis of this level 3 crime as compared to some other more—arguably more serious crimes. Different crimes. Crimes that are also very serious. Maybe I should classify them as that have shorter periods of post-release. And some of those examples would include aggravated kidnapping, attempted murder in the first degree, and second degree murder. All very, very serious offenses with very serious consequences to the victims, in some cases irreversible consequences, but I think one thing that distinguishes this particular level 3 crime is that when it comes to sexual crimes there is widely believed to be a propensity to commit those crimes, as opposed to some of these other crimes that were mentioned."

But when making its ruling, the district court vaguely stated that the second and third *Freeman* factors "may cut in favor of [Meeks]." The court continued to rule that looking at the totality of the three *Freeman* factors, it found Meeks' individual circumstances did not justify finding his lifetime postrelease supervision unconstitutional.

Meeks also argues the State failed to cross-appeal this determination by the court, hence the district court's ruling is binding on this court. When no objection is made to a district court's findings of fact or conclusions of law on the basis of inadequacy, an appellate court can presume the district court found all facts necessary to support its

judgment. *State v. Sanders*, 310 Kan. 279, 290, 445 P.3d 1144 (2019). But that does not mean that a district court's finding is binding on the appellate courts. Moreover, the district court's announcement of its finding was not conclusive. Reading the court's ruling in context, it was still in favor of the State, and only stated it may be possible that the second and third *Freeman* factors *could* favor Meeks. As such, there was no adverse ruling for the State to appeal.

Meeks makes two arguments: (1) any punishment following a commission of a new crime while under postrelease supervision would be disproportionate; and (2) the postrelease supervision period is disproportionate because more serious offenses in Kansas require the same postrelease supervision terms.

First, and most importantly, as discussed above, our Supreme Court has declined to consider what might happen in the future if a defendant commits a new crime. *Funk*, 301 Kan. at 938. And contrary to how Meeks frames the effect of the law, our statute does not automatically ensure a lifetime of prison following a subsequent commission of a felony or misdemeanor while under postrelease supervision.

After the amendment to the statute in 2013, K.S.A. 2021 Supp. 75-5217(c) states if a defendant under postrelease supervision commits a new felony, "the inmate shall serve a period of confinement, to be determined by the prisoner review board, which shall not exceed the remaining balance of the period of postrelease supervision, even if the new conviction did not result in the imposition of a new term of imprisonment." Likewise, if the defendant commits a new misdemeanor, "the inmate shall serve a period of confinement, to be determined by the prisoner review board, which shall not exceed the remaining balance of the period of postrelease supervision." K.S.A. 2021 Supp. 75-5217(d). Both violations would result in a prison sentence, but in both cases, the length of the confinement would be determined by the prison review board. Although either could theoretically incur a maximum lifetime sentence, this is speculatory and reflects only the

upper limit of the statutory requirement. See *Miller v. State*, No. 114,557, 2016 WL 7032240, at *5 (Kan. App. 2016) (unpublished opinion); *State v. Malmstrom*, No. 114,794, 2016 WL 5867240, at *8 (Kan. App. 2016) (unpublished opinion). It does not require him to "die in prison" as Meeks erroneously argues on appeal.

As to his second argument—that more serious sex crimes result in the same supervision term—this mistakes the basis of the second *Freeman* factor. The second *Freeman* factor requires a finding of a more serious crime resulting in a less severe punishment, not the same punishment. As Meeks points out, more serious offenses under the statute, including K.S.A. 2021 Supp. 21-5503(b)(1) (rape ranges from an off-grid crime to severity level 1 or 2 felony depending on the subsection), bear the same lifetime postrelease supervision sentence as his conviction under K.S.A. 2021 Supp. 21-5506(b)(1) (aggravated indecent liberties—sexual intercourse with child 14 or 15 years old—a severity level 3 felony).

Contrary to his argument, more serious sex crimes that carry the same postrelease supervision period are punished more severely because they are subject to longer prison sentences. Meeks fails to designate any specific offense, sex crime or other, and punishment that would render his lifetime postrelease supervision grossly disproportionate.

For these reasons, the second *Freeman* factor does not weigh in Meeks' favor.

3. *The third* Freeman *factor*

The final *Freeman* factor requires a comparison of the penalty with punishments in other jurisdictions for the same offense. *Mossman*, 294 Kan. at 908. Meeks argues the district court also found this factor to weigh in his favor. Yet, as discussed in the previous

analysis, the district court's ruling did not clearly state that the third *Freeman* factor favored Meeks. During sentencing, the district judge analyzed this third factor as follows:

> "On *Freeman* factor number 3, the analysis provided comes from a case that I'm not a hundred percent sure that the information is completely up to date, but since it's the most up-to-date information I have, I will state that at least at the time of *Proctor I*, that 18 states imposed mandatory lifetime post-release for at least some sex offenders but only four, including Kansas, have no mechanism for terminating that supervision, and 12 of the other 18 states impose it only for more—well, I don't know that that's the case, but I would say that it's fair to say that Kansas is among the more—has the more—has among the strictest of penalties as far as post-release for this type of crime."

Meeks argues the district court's finding is supported by our Supreme Court's finding in *Mossman*, which reviewed postrelease practices in other states.

Meeks is correct to a point. Our Supreme Court in *Mossman* found, after an extensive review of the sentencing scheme for lifetime postrelease supervision for sex crimes nationwide, that: "less than half of states provide for lifetime postrelease supervision of some or all sex offenders and, because several states have a mechanism for termination of the postrelease supervision under certain conditions, only a handful of states impose punishment as absolute as Kansas' requirement." 294 Kan. 920. But the *Mossman* court concluded that mandatory lifetime postrelease supervision of a violent sex offender does not constitute cruel and unusual punishment and noted several cases in other states that reached the same conclusion. 294 Kan. 919-21; see *Cameron*, 294 Kan. at 894. Given our Supreme Court's upholding of the lifetime postrelease supervision requirement, we find Meeks' argument unpersuasive.

*Conclusion*

Weighing all the three *Freeman* factors together, substantial competent evidence supports the district court's finding that the lifetime postrelease supervision imposed on Meeks is not unconstitutionally disproportionate to the crime for which that sentence is imposed.

Affirmed.